Gail G. MARSHALL, Petitioner

v.

STATE EMPLOYEES' RETIREMENT SYSTEM, Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 15, 2005.

Decided Nov. 23, 2005.

---

Rosadele T. Kauffman, State College, for petitioner.

Brian E. McDonough, Deputy Chief Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, Judge, and SIMPSON, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge LEADBETTER.

Gail Marshall appeals from an order of the State Employees' Retirement Board (Board) denying her claim, premised upon an Approved Domestic Relations order (ADRO), to fifty-percent of her ex-husband's State Employees' Retirement System (SERS) Option 4 lump sum withdrawal.[1] SERS denied the claim because it had permitted the assignment of the entire lump sum withdrawal to Penn State Uni-

---

1. An ADRO "authorizes the attachment of a SERS member's retirement benefits for purposes of equitable distribution under the Divorce Code, 23 Pa.C.S. §§ 3101—3904...." *Titler v. State Employees' Ret. Bd.,* 768 A.2d 899, 900 n. 1 (Pa.Cmwlth.2001). An "approved domestic relations order" is defined by the State Employees' Retirement Code (Retirement Code) as "[a]ny domestic relations order which has been determined to be approved in accordance with section 5953.1 (relating to approval of domestic relations orders)." 71 Pa.C.S. § 5102.

versity pursuant to a provision in the State Employees' Retirement Code (Retirement Code),[2] which authorizes the assignment of a member's benefits to satisfy an obligation to the Commonwealth for the repayment of money owed on account of the member's employment. In this case, Mrs. Marshall's ex-husband, John Marshall, was convicted of stealing funds from Penn State, his employer, and his sentence included restitution in the amount of approximately $387,000. We affirm.

The facts are not in dispute. Mr. Marshall, who was employed by Penn State for approximately 35 years, was terminated from his employment in January 2001. In February 2001, Mr. and Mrs. Marshall were divorced. Thereafter, in May 2001, the Court of Common Pleas of Centre County entered a domestic relations order (DRO),[3] designating Mrs. Marshall as an "alternate payee," entitled to receive fifty-percent of the marital property component of Mr. Marshall's retirement benefits, in-

cluding fifty-percent of Mr. Marshall's Option 4 lump sum withdrawal and monthly annuity payments.[4] The DRO defined Mr. Marshall's retirement benefit as "all monies [payable][5] to or on behalf of Member by SERS, including any lump sum withdrawals or scheduled ad hoc increases . . ." and provided that, "[t]he equitable distribution portion of the marital property component of Member's retirement benefit, as set forth in Paragraph (7), shall be payable to Alternate Payee and shall commence as soon as administratively feasible on or about the date the Member actually enters pay status and SERS approves a [DRO] incorporating this Stipulation and Agreement. . . ." SERS' Exhibit 3, R.R. 201a.

The DRO was approved by SERS in June 2001. In November of the same year, Mr. Marshall was sentenced for his theft in the Court of Common Pleas of Centre County and ordered to make restitution to Penn State.[6] In December 2001,

2. 71 Pa.C.S. §§ 5101—5956.

3. The Retirement Code defines a DRO as:
 Any judgment, decree or order, including approval of a property settlement agreement, entered . . . by a court of competent jurisdiction pursuant to a domestic relations law which relates to the marital property rights of the spouse or former spouse of a member, including the right to receive all or a portion of the moneys payable to that member under this part in furtherance of the equitable distribution of marital assets. . . .
 71 Pa.C.S. § 5102.

4. *See* 71 Pa.C.S. § 5705 for the various retirement options. Apparently, Mr. Marshall's Option 4 lump sum withdrawal was the amount of his total accumulated deductions. *See* 71 Pa.C.S. § 5705(a)(4) (providing that a portion of the benefit "may be payable as a lump sum, except that such lump sum payment shall not exceed an amount equal to the total accumulated deductions standing to the credit of the member.").
 An "alternate payee" is defined by the Retirement Code as "[a]ny spouse, former

spouse, child or dependent of a member who is recognized by a domestic relations order as having a right *to receive all or a portion of the moneys payable to that member under this part.*" 71 Pa.C.S. § 5102 (emphasis added).

5. Neither party takes issue with this correction to the DRO. The DRO actually states "all monies to or on behalf of Member by SERS, including any lump sum withdrawals or scheduled ad hoc increases. . . ."

6. Mr. Marshall was jointly and severally liable for restitution. Apparently three other people were involved in the theft of funds. . The court's order required Mr. Marshall to, inter alia: (1) "make restitution to the Pennsylvania State University in the amount of [$387,-145.45]" if he had not already done so; and (2) "cooperate with efforts through the [University], the Centre County Probation Department and any and all pension authorities to have the total available pension proceeds earned during [his] employment at the [University] be assigned to and payable to the Centre County Probation Department for the purpose of satisfying the outstanding restitution obligation." SERS' Exhibit 9, R.R. 213a.

Mr. Marshall executed an assignment under the Retirement Code, assigning all sums to which he was entitled, to Penn State, in order to satisfy the balance of his restitution obligation.[7] The assignment acknowledged that Mr. Marshall "will be entitled to a sum of money from [his] account with [SERS], of which [the court of common pleas had] previously ordered an unspecified sum to be assigned to [his] former wife, Gail Marshall, pursuant to a Court Order dated May 14, 2001...." R.R. 287a. Penn State then informed SERS that partial restitution payments from Mr. Marshall and the others involved in the theft had reduced the amount owed to approximately $267,000, and requested that that amount be withdrawn from Mr. Marshall's SERS account.

Thereafter, in January 2002, Mr. Marshall completed an annuity application package, wherein he elected the retirement option required by the DRO and named Mrs. Marshall as his survivor annuitant. In August of the same year, SERS sent an initial benefit letter to Mr. Marshall, reflecting that Mr. Marshall's Option 4 payment, totaling $107,274.89,[8] would be paid to Penn State and that his annuity payment of $3,303.62 would be divided between Penn State and Mrs. Marshall; Penn State would receive $1,651.81 monthly and Mrs. Marshall would receive $1,257.58 monthly. Shortly thereafter, Penn State requested the entire annuity payment rather than the designated fifty percent. Around the same time, SERS received a copy of Mr. Marshall's assignment and reviewed it for the first time. On August 20th, SERS sent Penn State a check for $107,274.89, which represented Mr. Marshall's entire Option 4 lump sum withdrawal. SERS then informed Mrs. Marshall that she would receive a monthly annuity payment in the amount of $1,257.58, and that it had given Penn State one-hundred percent of Mr. Marshall's Option 4 lump sum withdrawal.[9] Mrs. Marshall's subsequent appeal request was denied and her administrative appeal resulted in a hearing before a hearing examiner.

7. Common pleas' sentencing order indicates that Mr. Marshall was convicted of theft by unlawful taking. Mr. Marshall's assignment to Penn State states that he pled guilty to "multiple counts of theft by unlawful taking in violation of 18 Pa.C.S.A. Section 3925 [entitled, 'Receiving stolen property'], multiple counts of criminal conspiracy in violation of 18 Pa.C.S.A. Section 903 [entitled, 'Criminal conspiracy'], and one (1) count of criminal attempt, theft by unlawful taking in violation of 18 Pa.C.S.A. Sections 901 [entitled, 'Criminal attempt'] and 3921 [entitled, 'Theft by unlawful taking or disposition']." *See* Claimant's Ex. 8, R.R. 286a.

8. This amount comprises taxable and nontaxable payments totaling $130,081.49, less federal withholding in the amount of $22,806.60.

9. On July 25, 2003, common pleas entered an order which stated:
 [P]ension funds which had been previously set aside and Ordered by this Court to be distributed to Gail C. Marshall [have been] inadvertently paid to [Penn State] by the State Employees' Retirement System, [therefore] it is Ordered that [Penn State] shall return to Gail C. Marshall the sum of $50,419.59 and subtract same from the restitution credited on behalf of Defendant John C. Marshall.
R.R. 301a. Subsequently, pursuant to agreement of counsel, common pleas entered an order on August 14, 2003, vacating its order of July 25, in order that Mrs. Marshall's appeal from SERS' denial of her claim could be resolved. The court stated:
 Following the conclusion of that process, the Petition [presumably Penn State's petition to vacate] may become moot, or in the alternative, the parties may request the Court to schedule an argument date. In *the event an argument is held and the Court does not accept the positions advanced by* Penn State, the Order of this Court dated July 25, 2003 may be reinstated.
R.R. 303a.

Of particular note, both Marshalls testified during the hearing that they assumed that, notwithstanding Mr. Marshall's execution of the assignment of benefits to Penn State, Mrs. Marshall would still receive her share of Mr. Marshall's retirement benefits in accordance with the ADRO and Penn State would receive the share of benefits otherwise due Mr. Marshall. Also of importance, the SERS representative testified that when a member has an agency debt to repay, it is SERS' policy to withhold fifty percent of the member's monthly check. The SERS representative also implied that a lump sum payout is also applied to satisfy an agency debt. According to the SERS representative, if the total lump sum payout had not been paid over to Penn State, Mrs. Marshall would have received approximately $54,000 of those funds. The hearing examiner ultimately denied Mrs. Marshall's claim.

Prior to reviewing the bases for the hearing examiner's decision, we note the statutory provisions applicable to the instant action. Pursuant to Section 5953 of the Retirement Code, 71 Pa.C.S. § 5953, SERS has the authority to set-off a member's benefits if the member owes money to the Commonwealth on account of his employment. A member's benefits may also be attached in favor of an "alternate payee." Section 5953 provides:

(a) General rule.—

(1) Except as provided in paragraphs (2), (3) and (4), the right of a person to any benefit or right accrued or accruing under the provisions of this part and the moneys in the fund are hereby exempt from any State or municipal tax, levy and sale, garnishment, attachment, spouse's election, or any other process whatsoever except for a set-off by the Commonwealth in the case provided in subparagraph (i), and shall be unassignable except:

(i) To the Commonwealth in the case of a member who is terminating State service and has been determined to be obligated to the Commonwealth for the repayment of money owed on account of his employment or to the fund on account of a loan from a credit union which has been satisfied by the board from the fund....

(ii) To a credit union as security for a loan not to exceed $750 and interest not to exceed 6% per annum discounted and/or fines thereon if the credit union is now or hereafter organized and incorporated under the laws of this Commonwealth and the membership of such credit union is limited solely to officials and employees of the Commonwealth....

(2) Rights under this part shall be subject to forfeiture as provided by the act of July 8, 1978 (P.L. 752, No. 140), known as the Public Employee Pension Forfeiture Act [Forfeiture Act], and by or pursuant to section 16(b) of Article V of the Constitution of Pennsylvania.... [10]

(3) Rights under this part shall be subject to attachment in favor of an alternate payee as set forth in an approved domestic relations order.

. . . .

(b) Authorized payments from fund.— The board shall be authorized to pay from the fund:

(1) In the case of a member who is terminating service, the amount determined after certification by the head of

---

**10.** The Forfeiture Act does not apply in this case because Mr. Marshall's crime was not one of the enumerated offenses that trigger the Act's application. *See generally* Section 2 of the Forfeiture Act, Act of July 8, 1978, P.L. 752, *as amended*, 43 P.S. § 1312.

the department that the member is so obligated, and after review and approval by the department or agency's legal representative or upon receipt of an assignment from the member in the amount so certified.

(Footnote added). Section 5953.1 of the Retirement Code, relating to the approval of domestic relations orders, provides, in part, that an order shall be certified as an approved order if it, inter alia, "[r]equires the system to provide no more than the total amount of benefits than the member would otherwise receive (determined on the basis of actuarial value). . . ." 71 Pa. C.S. § 5953.1(a)(2).

With this statutory framework in mind, we turn to the hearing examiner's decision. In denying the claim, the hearing examiner noted that SERS' policy is to withhold one-hundred percent of a member's accumulated deductions to satisfy an agency debt and if a balance remains thereafter, then SERS withholds fifty percent of the member's monthly annuity check until the debt is repaid. Implicit in the hearing examiner's reasoning is that this policy, interpreting Section 5953 of the Retirement Code, is entitled to deference because it is not clearly erroneous or contrary to the statutory provision.

The hearing examiner also concluded, without citing to any specific authority, that Mrs. Marshall's interest in the retirement benefit at issue is derivative to Mr. Marshall's interest. Therefore, since Mr. Marshall accumulated the "debt" while earning the retirement benefit, he loses his right to the full retirement benefit because it is subject to set-off as a result of the debt. Consequently, once Mr. Marshall lost his right to a portion of the retirement benefit, Mrs. Marshall lost her right to that benefit as well, because the ADRO cannot provide Mrs. Marshall with greater rights in the lump sum withdrawal than those possessed by Mr. Marshall.

On appeal, the Board overruled Mrs. Marshall's exceptions, and adopted as its own, the hearing examiner's findings, conclusions and discussion. Due to several exceptions raised by Mrs. Marshall, however, the Board supplemented the hearing examiner's decision with additional conclusions and further discussion.

Specifically, the Board rejected the argument that the ADRO should be given priority because it preceded Mr. Marshall's restitution obligation. According to the Board, the fact that the DRO was entered prior to Mr. Marshall's sentencing and retirement does not serve to separate and attach a portion of the benefits for Mrs. Marshall, removing them from the reach of 71 Pa.C.S. § 5953. In reaching this conclusion, the Board noted that the DRO provided that the marital property component of Mr. Marshall's retirement benefit was based in part on Mr. Marshall's retirement benefit *"as of the effective date of retirement,* calculated by using Mr. Marshall's final average salary on May 17, 1994, instead of Mr. Marshall's actual final average salary." Board's opinion at 3 (emphasis in original). The Board also took note that the DRO defined the "retirement benefit" as "all monies to [sic] or on behalf of [Mr. Marshall] by SERS, including any lump sum withdrawals. . . ." *Id.* at 4. The Board concluded that when the DRO was entered, the parties sought to attach Mr. Marshall's retirement benefit at the time he retired and, since the benefit divisible between the parties was based upon a formula that included Mr. Marshall's total years of service, the amount of the retirement benefit could not be determined or divided until actual retirement. Thus, the Board concluded that while the DRO granted Mrs. Marshall a right to a portion of the retirement benefit payable

to Mr. Marshall, the formula adopted by the parties to determine Mrs. Marshall's share precluded a determination of that share until Mr. Marshall actually retired and SERS' calculated his benefit. In addition, since Mr. Marshall assigned his right to retirement benefits to Penn State prior to submitting his retirement application, the Board concluded:

> The assignment neither uses a formula to calculate Penn State's share of the retirement proceeds nor bases the assignment on the benefit payable upon Mr. Marshall's retirement. In our opinion, Mr. Marshall's conveyance of his benefit right to Penn State is a present conveyance of vested rights that already exist, as opposed to the DRO's creation of an expectancy interest in the benefits available to Mr. Marshall at retirement after all relevant factors are applied to his benefit account.

Board's opinion at 6. Mrs. Marshall then proceeded with her appeal to this court.

On appeal, Mrs. Marshall first argues that SERS erred in paying the entire lump sum withdrawal to Penn State because the ADRO had already attached a portion of the benefit in her favor prior to Mr. Marshall incurring a restitution obligation or assigning his benefits to Penn State.[11] According to Mrs. Marshall, once the ADRO attached the funds, they were no longer a part of Mr. Marshall's retirement benefit. In support of this argument, Mrs. Marshall relies on *Titler v. State Employees'*

*Retirement Board,* 768 A.2d 899 (Pa. Cmwlth.2001).

Mrs. Marshall also argues that there is no legal authority which requires that the assignment to Penn State be given precedence over a pre-existing ADRO. Mrs. Marshall notes that Section 5953 is silent in this regard, failing to indicate any priority among claims. Moreover, she argues that her interest in the retirement benefits is as fully "vested" as Penn State's.

On the other hand, the Board begins by noting that it has interpreted and applied Section 5953 to allow it to withhold one-hundred percent of the member's accumulated deductions to satisfy an agency debt if the accumulated deductions have not already been paid to the member. This is what occurred here. The Board also notes the established principle that its policy and action must be upheld if it is not clearly erroneous or inconsistent with the statute.

In addition, noting the language of the ADRO,[12] the Board contends that Mrs. Marshall's rights are derivative and, therefore, since Mr. Marshall's right to benefits is subject by statute to attachment/set-off for an agency debt, then so too is Mrs. Marshall's interest. According to the Board, once Mr. Marshall's benefits were subject to set-off by the Commonwealth, they were no longer part of his retirement benefit.

It is well settled that "retirement pension benefits, both vested and non-vested, are marital property subject to equita-

---

**11.** This appeal only concerns Mr. Marshall's lump sum payment. Penn State did not appeal from the Board's order and no issue has been raised regarding Mrs. Marshall's receipt of a portion of the monthly annuity payment.

**12.** Specifically:

> Member's retirement benefit is defined as all monies [payable] to or on behalf of Member by SERS....
>
> ....

> In no event shall Alternate Payee have greater benefits or rights other than those which are available to Member. Alternate Payee is not entitled to any benefit not otherwise provided by SERS. Alternate Payee is only entitled to the specific benefits offered by SERS as provided in this Stipulation and Agreement....

SERS' Ex. 3, ¶¶ 8, 13, R.R. 201a, 205a.

ble distribution." *Brown v. Brown*, 447 Pa.Super. 424, 669 A.2d 969, 972 (1995), *aff'd*, 547 Pa. 360, 690 A.2d 700 (1997).[13] *See also* Wilder, Pa. Family Law Practice and Procedure, § 23–1 (3rd ed. 1993). Moreover, statutory provisions exempting pension benefits from levy, sale, garnishment, attachment and the like do not protect a member's pension benefits from equitable distribution. *See generally Young v. Young*, 507 Pa. 40, 488 A.2d 264 (1985); *Graham v. Graham*, 396 Pa.Super. 166, 578 A.2d 459 (1990). Our Superior Court explained the rationale for this exception in *Graham*, stating:

> First, [r]etirement funds ... are created for the protection of not only the employee, but for the protection of his family as well. Hence, the provisions exempting assignments and attachments contained therein are to relieve the person exempted from the pressure of claims that are hostile to his *and to his dependents' essential needs.*
>
> Second, we note that a family loses its ability to spend a portion of its income when that income is deferred and placed in a pension. It would be terribly unfair to read an exemption statute, which was created to protect a pension for the benefit of a retired employee's family, in

such a way that the exemption would bar children or a former spouse from receiving support from the very fund created for their benefit, and would once again deny them the benefits of the income they sacrificed to a pension years before.

578 A.2d at 461 (citations and quotations omitted). The General Assembly, recognizing the uniqueness and importance of familial claims to pension benefits, enacted those provisions of the Retirement Code, which acknowledge and establish the rights of an alternate payee with respect to a member's benefits. Pursuant to Section 5953(a)(3), a member's benefits "shall be subject to attachment in favor of an alternate payee." [14]

Notwithstanding an alternate payee's established statutory right to a member's benefits via an ADRO, the Retirement Code lacks express language determining the priority between a claim by the Commonwealth for moneys owed by a member upon retirement as a result of his employment and a claim by the member's alternate payee. Neither party has cited to any authority on point in this regard nor has this court's research uncovered any relevant decisional law.[15] Thus, we examine the statutory

**13.** In *Brown*, the Superior Court observed that:

> In formulating equitable distribution schemes, Pennsylvania courts apply either the immediate offset method, which divides the benefits at the time of the equitable distribution proceeding by assigning a present value to the marital portion of the pension, or the deferred distribution method, which requires the court to reserve jurisdiction over the benefits until they mature and enter pay status.... *See Zollars v. Zollars*, [397 Pa.Super. 204, 579 A.2d 1328 (1990)] (use of deferred distribution not error when record did not show that ex-spouse could buy out non-employee spouse's share).
>
> 669 A.2d at 972–73 (citations omitted).

**14.** Similarly, the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, et seq., as amended by the Retirement Equity Act of 1984, 29 U.S.C. § 1056(d), which is not applicable herein because a state pension is involved, contains provisions precluding the assignment or alienation of plan benefits. *See* 29 U.S.C. § 1056(d).

**15.** We do not find *Titler v. State Employees' Retirement Board*, 768 A.2d 899 (Pa.Cmwlth. 2001), relied upon by Mrs. Marshall, to be controlling here. There, the husband, a member of SERS, died before the parties' divorce was finalized. Prior to his death, husband changed his primary SERS beneficiary from wife to another relative. Despite the fact that the parties were still married

scheme to determine the nature of an alternate payee's rights and the priority of the claims in these circumstances. After a close reading of the statute, we conclude that contrary to Mrs. Marshall's assertion, a DRO does not serve to immediately attach funds in a member's retirement account, thereby severing, separating and securing the same such that they are protected from pre-maturation contingencies. Rather, we conclude that the statutory scheme supports the conclusion that an alternate payee's rights are derivative to the member's and subject to the same contingencies affecting the member's entitlement to benefits.

 We begin our analysis by noting that:

An administrative agency has wide discretion in establishing rules, regulations and standards, and also in the performance of its administrative duties and functions. Where an agency has not abused its discretion in the exercise of its duties or functions, we must defer to its expertise and cannot substitute judicial discretion for administrative discretion. In addition, we have consistently recognized that an administrative agency's interpretation of its own regulations is controlling unless the interpretation is plainly erroneous or inconsistent with either the regulation or the statute under which it is promulgated.

*Daneker v. State Employes' Ret. Bd.*, 156 Pa.Cmwlth. 511, 628 A.2d 491, 496–97 (1993) (citations and quotation omitted). Turning to the statute, we first note the definition of an "alternate payee," which is defined as, inter alia, a former spouse of a member "who is recognized by a[DRO] as having a right to receive all or a portion of the *moneys payable to that member* under this part." 71 Pa.C.S. § 5102 (emphasis added). Thus, the definition of an alternate payee incorporates the premise that an alternate payee's benefits are limited to those that are payable to the member. This premise is echoed in the definition of a "domestic relations order," which also recognizes the right of an alternate payee to receive "all or a portion of the moneys *payable to that member.*" *Id.* (emphasis added) Similarly, Section 5953.1 of the Retirement Code, relating to the approval of DROs, limits an alternate payee's rights "to no more than the total amount of benefits than the member would otherwise receive (determined on the basis of actuarial value). . . ." 71 Pa.C.S. § 5953.1(a)(2). The DRO entered by common pleas in this case follows the statutory language, defining the "retirement benefit" subject to equitable distribution as "all monies [payable] to or on behalf of [Mr. Marshall], including any lump sum withdrawals. . . ." SERS' Ex. 3, R.R. at 201a. In addition, the DRO provides that the marital property component of Mr. Marshall's retirement benefit

when husband died, SERS intended to pay husband's death benefit to the most recently named beneficiary. At that point, a DRO had not been entered. Wife then commenced an administrative action before the Board seeking to be named husband's primary beneficiary. Wife's claim was denied.

On appeal, this court acknowledged that while husband's SERS account was a marital asset subject to equitable distribution, the Retirement Code did not preclude a member from changing his beneficiary or selecting a beneficiary different than one's spouse. The

court observed that in order for an estranged spouse to protect her interest in a member's SERS account, the spouse should either obtain an injunction from common pleas to maintain the status quo or obtain a divorce decree and accompanying DRO, "which specifies the amount of the member's retirement benefit that SERS must distribute to an alternate payee." 768 A.2d at 902. Contrary to Mrs. Marshall, we do not read *Titler* to hold that a DRO serves to attach retirement funds when entered, thereby securing and setting aside benefits in the alternate payee's favor.

is the coverture fraction [16] multiplied by Mr. Marshall's retirement benefit as of the effective date of his retirement. *Id.*, R.R. at 200a.

Like the Board, we do not construe these statutory provisions, nor the DRO, to support the conclusion that a DRO or ADRO serves to attach and separate funds from a member's retirement benefits such that they are no longer a part of the benefit at the time of retirement. Rather, the language of both the statute and the DRO support the Board's construction that an alternate payee's rights are derivative to those of the member. Consequently, contingencies that affect the member's right to or amount of benefits will also impact the alternate payee's share of the member's benefits.[17]

In reaching this conclusion, we note that Mrs. Marshall's focus on the fact that her interest arose or vested prior to the as- signment to Penn State is misplaced. While Mrs. Marshall is correct that she had a vested interest in Mr. Marshall's pension, under the plain language of the statutes she is limited to her share of those benefits "payable to the member" under the Retirement Code. Moreover, we find it significant that the Commonwealth is stat- utorily entitled to a set-off against the member's retirement benefits, while an al- ternate payee is entitled only to attach the benefits payable to the member. Since funds which are set-off never come into the possession of the debtor, they would never become available for attachment. This distinction reinforces the conclusion based upon the statutory language dis- cussed above that the General Assembly intended SERS to satisfy obligations to the Commonwealth before paying amounts subject to attachment or assignment to other creditors under Section 5953. Be-

---

**16.** The coverture fraction is that "portion of the value of the pension that is attributable to the marriage." *Berrington v. Berrington*, 534 Pa. 393, 398 n. 5, 633 A.2d 589, 592 n. 5 (1993).

**17.** While we did not find any controlling deci- sional law, one case worth noting is *Gaudet v. Sheet Metal Workers' National Pension Fund*, 216 F.Supp.2d 582 (E.D.La.2002), *aff'd w/o op.* 71 Fed.Appx. 441 (5th Cir.2003), *cert. denied*, 540 U.S. 1089, 124 S.Ct. 958, 157 L.Ed.2d 794 (2003). There, the husband em- bezzled funds from his union and its employ- ee benefit plans. Notably, the amount embez- zled exceeded the pension benefits husband would have been entitled to upon retirement. The husband's subsequent criminal sentence included restitution to the union in an amount in excess of 2.5 million dollars, which the district court ordered to be satisfied in part by husband relinquishing his pension funds. Since the issue of whether ERISA's anti-alien- ation provisions prevented relinquishment of the pension funds was not properly raised before the district court, the appellate court affirmed on appeal.

Several years after husband's conviction, the couple separated and entered into a DRO, which established wife as an alternate payee to one-half of the pension benefits "due and payable" to husband. When the fund refused to pay benefits, the parties then apparently filed a civil suit against various defendants, including the pension fund, contending that they were entitled to husband's pension bene- fits. In the context of a motion for summary judgment, the court examined various federal court decisions addressing ERISA's anti- alienation provisions and the exceptions thereto. The court ultimately held that hus- band was not entitled to any pension benefits because he had embezzled more than he was entitled to, i.e., no double dipping (as opposed to whether an off-set was proper). As a corol- lary, the court also held that while wife had an interest in one-half of husband's pension, her right was contingent upon husband being entitled to receive his retirement benefits. Accordingly, since the court had determined that husband had already received his pen- sion, albeit through embezzlement, he was not entitled to any money from the fund. Therefore, the court held that wife's action for her interest should be against husband—"who through his own actions reaped the entirety of his pension benefits before they were due." *Id.* at 591.

cause the nature of Mrs. Marshall's right is different from that of the Commonwealth, it is irrelevant that the assignment/paperwork executed to accomplish the set-off occurred after the ADRO.[18]

The Board's interpretation of Section 5953 is not only consistent with the statutory language but is consistent with sound policy as well. Accepting Mrs. Marshall's interpretation would put divorced spouses who have obtained a DRO in a better position than dependents of an indebted member whose marriage has remained intact, or of widow(er)s of indebted members. All of these persons have been harmed by the member's conduct, sometimes wrongful conduct of which the dependents were unaware, and they are equally deserving of sympathy. There is simply no reason to believe that the General Assembly intended to mitigate that harm for only one class of dependents—those who have obtained a divorce. In addition, subordinating the debt to the Commonwealth in favor of the marital debt recognized in a DRO creates an incentive for manipulation of the system. Specifically, a couple who has reaped the benefits of a SERS' member's theft from an employer could subsequently obtain a divorce in order to protect and shelter a substantial portion of the funds subject to set-off under Section 5953. While we do not in any way suggest that such collusion occurred here, the fact that it could occur is yet another reason to conclude that the legislature did not intend to create a divorce loophole in the Commonwealth's right to set-off.

For the foregoing reasons, we conclude that the Board's interpretation is neither plainly erroneous nor inconsistent with the statute it is charged to enforce. Accordingly, we affirm the order of the Board.

## ORDER

AND NOW, this 23rd day of November, 2005, the order of the State Employees' Retirement Board in the above-captioned action is hereby affirmed.

CONCURRING OPINION BY Judge SIMPSON.

I concur in the thoughtful result reached by the majority. I briefly note that the result here is also consistent with common law principles of assignment. Thus, an assignee's right against the obligor is subject to all of the limitations of the assignor's right, to all defenses thereto, and to all set-offs and counterclaims which would have been available against the assignor had there been no assignment, provided that these defenses and set-offs are based on facts existing at the time of assignment. *Peoples Pittsburgh Trust Co. v. Commonwealth*, 359 Pa. 622, 60 A.2d 53 (1948); *Smith v. Cumberland Group, Ltd.*, 455 Pa.Super. 276, 687 A.2d 1167 (1997); Restatement (Second) of Contracts § 336 (1981). In other words, the rights of the assignee here, the former wife, are subject to set-off for thefts from the employer committed before the assignment/approved domestic relations order.

It is noteworthy that the result here is the same under the statute and under common law principles. Analysis of the common law is helpful where, as here, the statute lacks express controlling provisions. *Borough of Pitcairn v. Westwood*, 848 A.2d 158 (Pa.Cmwlth.2004) (statutes

18. If the Commonwealth's right were based upon Mr. Marshall's assignment to it, Mrs. Marshall's argument would have some merit. *See generally* Restatement (Second) of Contracts § 342 (1981). However, the Commonwealth's right under the statute is not in any way dependent upon an assignment by the member.

are never presumed to make any innovation in the rules and principles of the common law beyond what is expressly declared in their provisions).