The **UNIFIED SPORTSMEN OF PENNSYLVANIA by And through THEIR MEMBERS, individually And collectively, Petitioners**

v.

The **PENNSYLVANIA GAME COMMISSION (PGC), and the Commissioners of the PA Game Commission (in their official capacity) of the Commonwealth of Pennsylvania, Respondents.**

Commonwealth Court of Pennsylvania.

Decided Feb. 8, 2011.

Publication Ordered March 25, 2011.

Charles B. Haws, Reading, for petitioners.

Timothy P. Keating, Senior Deputy Attorney General, for respondents.

OPINION BY Senior Judge FEUDALE.

Before the Court is the motion for summary judgment of the Pennsylvania Game Commission and its Commissioners (Commission).

On September 7, 2010, the Unified Sportsmen of Pennsylvania, by and through its members (Sportsmen), filed a petition for review in the nature of a request for declaratory judgment and equitable relief (petition) in this court's original jurisdiction. In relevant part, Sportsmen aver the following. Sportsmen are a group of hunters and outdoorsmen whose

membership exceeds 30,000 individuals. They bring the petition in an effort to protect and preserve Pennsylvania's deer herd. Although not alleged in the petition, the Commission is the executive agency charged with the protection, propagation, management and preservation of game and wildlife in Pennsylvania and administration of the Game and Wildlife Code (Game Code), 34 Pa.C.S. §§ 101–2965.

The petition alleges the Commission failed in its duties and responsibilities to preserve and protect the deer herd for Pennsylvanians generally and for Sportsmen in particular. According to Sportsmen, the Commission abused its discretion and acted in violation of the law and the Deer Management Assistance Program (DMAP) in the allocation of antlerless deer licenses issued for the 2007 hunting season. The petition alleges the Commission intentionally acted to destroy and diminish Pennsylvania's deer herd below natural and sustainable population levels, in violation of Article I, Section 27 of the Pennsylvania Constitution. That Section provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. 1, § 27.

The petition further avers the Commission failed to act in accordance with Section 322(a), (c)(11)-(13) of the Game Code, which provides:

> § 322. Powers and duties of commission.
>
> (a) **Duties.**—It shall be the duty of the [C]ommission to protect, propagate, manage and preserve the game or wildlife of this Commonwealth and to enforce by proper actions and proceedings, the laws of this Commonwealth relating thereto.
>
> . . .
>
> (c) **Specific powers and duties.**—In order to administrate and enforce this title, the [C]ommission through proper action shall:
>
> . . .
>
> (11) Collect, classify and preserve such statistics, data and information *as in its judgment* will tend to promote the object of this title and take charge of and keep all reports, books, papers and documents which shall, in the discharge of its duties, come into possession or under its control.
>
> (12) Take any necessary action to accomplish and assure the purposes of this title.
>
> (13) Serve the interest of sportsmen by preserving and promoting our special heritage of recreational hunting and furtaking by providing adequate opportunity to hunt and trap the wildlife resources of this Commonwealth.

34 Pa.C.S. § 322(a), (c)(11)-(13) (emphasis added).

The Commission violated this mandate, according to Sportsmen, by failing to collect scientifically reliable reproductive data and issuing too many antlerless deer licenses based on the unreliable data. Specifically, Sportsmen complain the Commission collects reproductive data by examining the pregnancy rates of road-killed deer in each of the state's 22 wildlife management units (WMU). Examination of road-killed deer provides too small a sampling on which to allocate antlerless deer

licenses.[1] Sportsmen allege that proper data collected by way of scientifically reliable surveys (including aerial surveys, annual deer harvest reports from hunters, and data collected from deer processing facilities) would provide data that is more reliable. Relying on insufficient data is an abuse of the Commission's discretion, according to Sportsmen. The Commission's reliance on the unreliable data, in turn, affects the number of antlerless deer permits the Commission issues and their allocation throughout the state. According to Sportsmen, the Commission's reliance on insufficient data eventually leads to inadequate opportunities for hunting deer in Pennsylvania.

Sportsmen further allege the Game Code charges the Commission with regulating issuance of antlerless deer licenses under 58 Pa.Code § 143.41. Section 143.41 provides in pertinent part:

(a) The intent of this section is to ensure a fair and equitable distribution of licenses.

(b) The [Commission], after reviewing reproductive data, will establish the number of antlerless deer licenses allocated in each [WMU]. Licenses will be distributed among county treasurers for issuance on the basis of percentage of land each county represents in the unit.

*Id.*

Sportsmen alleged that reliance on road-killed deer reproductive data is not the type of "careful State-wide study" the Commission performed in *Lehman v. Pennsylvania Game Commission*, 34 Pa.

D. & C. 662 (1938). In that case, Dauphin County, acting as the Commonwealth Court, found the Commission's declaration of a six-day open season on antlerless deer was based on a "careful, expert, and scientific performance by the Commission of its duty as an agency of the Commonwealth to protect, propagate, manage, and preserve the game of the Commonwealth in accordance with its laws." Pet. for Review, ¶ 23, (quoting *Lehman*, 34 Pa. D. & C. at 669).

In addition, Sportsmen allege the Commission failed to provide an adequate opportunity for public comment before allocation of antlerless deer licenses, in violation of Section 328(a) of the Game Code, 34 Pa.C.S. § 328(a). That section requires the Commission to implement policies and programs to improve its relationship with the public and its licensees. However, the Commission has failed to implement any policies or programs relating to the antlerless deer allocation program.

The above allegations center on the 2007 hunting season and the 2003–2007 "Population Management Plan for White-Tailed Deer in Pennsylvania" (Management Plan). The Commission's goals, as established in the Management Plan, are to manage a healthy deer population with a focus on deer health, to manage a healthy forest habitat, and to reduce human-deer conflicts. Sportsmen allege the Commission focuses too heavily on the goal relating to habitat health at the behest of Pennsylvania's timber interests.[2]

---

1. Sportsmen allege the Commission examined 880 does for the 2004–2005 hunting season, which equates to one doe per 42,000 acres in the state, or 40 deer per WMU. Pet. for Review, ¶ 14. The Commission issued 865,000 antlerless deer permits, 6,000 more permits than issued for the prior hunting season. *Id.* at 29.

2. Sportsmen further allege the Commission, through the Deer Management Assistance Program (DMAP), permits property owners, including political subdivisions or government agencies, to enroll property for the purposes of authorizing the killing of antlerless deer. Property owners may enroll land where there is documented evidence that deer

Moreover, allowing state agencies to enroll public lands in the DMAP, below, further diminishes the strength and continued viability of Pennsylvania's deer herd.

Sportsmen allege that requiring the Commission to review and collect appropriate reproductive data pursuant to 58 Pa.Code § 143.41(b) will serve to ensure that the Commission properly issues and allocates antlerless deer permits, which will in turn ensure that the natural and appropriate population of the deer herd is achieved and maintained. Requiring the Commission to assess data that is more reliable will ensure that the allocation of antlerless deer permits does not have the net effect of authorizing the killing of more antlerless deer than the herd can naturally sustain.

In their petition for review, Sportsmen seek injunctive relief ordering the Commission to collect appropriate reproductive data and to halt the taking of female deer on publicly owned state game and forest-land pending collection of data pertaining to the geographic composition and dispersion of Pennsylvania's deer herd. Thereafter, the Commission may issue and allocate proper number of antlerless deer permits.

The Commission filed preliminary objections to Sportsmen's petition for review, which this Court overruled in *Unified Sportsmen of Pennsylvania v. Pennsylvania Game Commission,* (Pa.Cmwlth., No. 427 M.D. 2005, filed January 10, 2007). The Commission subsequently filed its answer and new matter. In new matter, the Commission generally alleged Sportsmen failed to identify what they believe to be Pennsylvania's deer population, failed to conduct or commission scientific surveys to determine the deer population, failed to

request a hearing before the Commission concerning their claims, and failed to gather information regarding how other states determine their deer population. Sportsmen properly filed a reply to the new matter admitting in part and denying in part the allegations of the Commission's new matter.

The parties proceeded to discovery and the Commission subsequently filed the instant motion for summary judgment. In its motion, the Commission contends those members of Sportsmen that testified are only complaining about the reduction of deer in limited geographic areas (specifically, WMUs 2G and 2F) and believe that hunters have the right to hunt deer in the geographic area of their choice. In addition, the Commission alleges Sportsmen failed to produce a single expert supporting its claim that the Commission's Management Plan is not scientifically reliable. Rather, Sportsmen rely on the opinions of its members and have no evidence that the manner in which the Commission conducts its program is an abuse of discretion. Thus, Sportsmen failed to show there are undisputed material facts precluding summary judgment.

After reviewing the list of its "expert" witnesses, Sportsmen's one-page argument in response to the Commission's motion for summary judgment is as follows, in relevant part.

> [The Commission] propounded two sets of interrogatories and a request for the production of documents. The parties also conducted a total of seven depositions. As set out above, all of that discovery has demonstrated to the parties *how different their view on deer management are.*

cause material destruction to cultivated crops, fruit trees or vegetables. Sportsmen aver the practical effect of the program is to allow the

killing of deer in excess of the level necessary to maintain a healthy herd.

## CONCLUSION

Based on the foregoing, it is clear that there are issues of material fact in dispute and that as a result, the [Commission] is not entitled to summary judgment. Moreover, viewing the record in the light most favorable to [the Sportsmen], this Honorable Court must deny [the Commission's] Motion for Summary Judgment.

[Sportsmen's] Brief in Support of Response to [the Commission's] Motion for Summary Judgment, at 17–18 (emphasis added).

Based on our review, we do not discern any material questions of fact precluding consideration of summary judgment in favor of the Commission.

We begin by reviewing the various depositions taken in this matter. Christopher Rosenberry is a supervisor in the deer and elk section of the Commission. He stated that around 2005, the Commission changed from a "quantitative" program (number of deer) to a "qualitative" program (health of deer). Under the new program, and based in part on stakeholder interest,[3] the Commission formulated the three goals of the Management Plan: to improve deer health, to improve habitat health, and to reduce human-deer conflicts. He explained that the number of deer in a WMU does not necessarily drive the number and allocation of deer licenses. If the deer population in a particular WMU is high and the Commission's goal is to reduce the number of deer, the number of licenses allocated to that WMU is high. Similarly, if the hunt success rate is low for a WMU, the Commission may increase the number of licenses allocated to that WMU.

The Commission assesses the deer population by data received from the antlered buck harvest, antlerless hunter success rate, and a population index. Deer health is collected from necropsies performed on road-killed deer retrieved February through May. Female deer are examined for the number of fetuses, and the Commission equates 1.5 embryos per doe as a sign of good deer health.[4] The Commission strives to obtain a coefficient of less than 13%, which it deems sufficient for accurate population management. That is, if the coefficient is greater than 13%, the Commission seeks a larger sampling of deer.[5]

The United States Forest Service provides data on forest habitat health. Rosenberry explained the Forest Service divides the Commonwealth into blocks, and then into plots within the blocks. The Forest Service examines the plots, and micro-plots within the plots, for forest health and regeneration. Assessment of the forest health may cause changes in the deer license allocation. Looking to the target of 1.5 embryos per doe, and in consideration of the forest assessment, the Commission's deer and elk section makes

---

3. Stakeholder interest is interest in management of the deer herd shown by groups outside the Commission. It includes such groups as hunters, farmers, environmentalists, representatives from the timber industry, etc. The groups comprise a citizen advisory committee (CAC), which makes a collective recommendation to the Commission.

4. In his expert report, Rosenberry opined examination of doe for embryos as a measure of deer health eliminates the influence of factors affecting fawn survival between birth and hunting season such as predation, habitat composition and quality, winter severity, and hunter selectivity. Commission's Documents in Support of Summary Judgment (Documents), Vol. III, Ex. J, at 7.

5. The Commission pools the collection of data for two and three-year old females when there is no statistical difference between age class reproductive rates. *Id.*

recommendations to the Game Commissioners regarding number and allocation of deer licenses. For example, if the Forest Services rates the forest health as fair, the deer and elk section may recommend an increase in the allocation of deer licenses for that WMU if the deer population is stable or if the Citizen Advisory Committee (CAC) recommends increased allocations.

The Department of Conversation and Natural Resources (DCNR) has no impact on the antlerless allocation. Rosenberry is aware that the DCNR conducted aerial surveys in the past; however, the Commission did not incorporate the information into the Management Plan because the flights were of non-representative areas within a WMU. In addition, Rosenberry stated that DCNR conducted the aerial surveys in fall or winter, when trees are bare. This is not a good way to predict deer reproduction because fawns are born in the spring, when trees are leafing.

Rosenberry testified that the Commission instructs wildlife conservation officers (WCO) to collect as many road-killed deer as possible, and suggest a minimum of 100 doe per WMU. In recent years, WCOs have collected an average of 75 doe per WMU. In 21 of the 22 WMU, the deer health assessment is at target or near target (1.5 embryos per doe); therefore, the deer health assessment is not a driving force behind license allocations.

Rosenberry testified that 38% of hunters return cards regarding the success of a hunt. The Commission compares the re-turn cards with data collected from meat processing facilities. The Commission now has on-line reporting. He believes there has been a sustainable harvest for the past few years.[6]

Calvin DuBrock also testified. He is the director of the Bureau of Wildlife Management within the Commission. He primarily reviews the information Rosenberry's unit provides and makes recommendations to the Commission. He reiterated Rosenberry's testimony that the Commission seeks to examine every deer it can but recognized it is harder to collect road-killed deer because the state now permits people to pick up deer on the side of the road and because vehicles hitting deer cause more destruction due to increased speed limits.

DuBrock testified that there are 135 WCOs in the state, and some WCOs have deputies. WCOs collect deer from the surrounding landscape, from the sides of roads, from informal relationships with the Department of Transportation, from local residents, and from arrangements between private contractors.

DuBrock stated there was little interplay between the DMAP and the antlerless program. Specifically, the purpose of the DMAP is to allow private landowners to actualize land management objectives of land affected by deer. The Commission may issue a landowner one permit to kill a deer per 50 acres of land.

He considers the CAC's position in his recommendation to the Commissioners. The Commission based its Management

---

6. The Commission estimates the number of deer harvests not reported and uses a science-based method of estimating total deer harvest. *Id.* at 17. Deer harvest is the primary source of estimating population trends. *Id.* at 20. To monitor deer population trends, the Commission considers the antlered harvest index, the antlerless hunter success index, and a modified sex-age-kill deer population monitoring procedure. *Id.* at 21.

In his report, Rosenberry further explained that Pennsylvania has a long history of adjusting the number of antlerless deer licenses issued, and allocations do not always indicate an objective to harvest more antlerless deer. *Id.* at 24.

Plan, in part, on discussions with the CAC. DuBrock does not directly consider habitat information in his recommendation to the Commissioners, as that information is considered in the deer and elk section's recommendation to him. Of particular interest, DuBrock stated that sometimes a biological carrying capacity (what the land can support) is defined for a single species in isolation without consideration of the impact on the other species that are dependent on the same environment. The Commission is faced with a balancing act of "trying to figure out how many deer can we provide on a landscape but at the same time still provide and not have a negative—provide adequate numbers and not have negative consequences for other species that depend upon the habitat that deer impact." Commission's Documents In Support of Summary Judgment (Documents) Vol. I, Ex. D., at 56.

Carl Roe, Executive Director of the Commission since December 2005, is responsible for management of the Commission's six bureaus. DuBrock briefs Roe on the materials subordinates develop, and reviews their recommendations prior to presenting the information to the Commissioners. He agreed 100 deer per WMU would be an ideal number for sampling. Roe believes that the deer population has remained stable since 2006, having increased in some WMUs and decreased in other areas.

Roe corroborated Rosenberry and DuBrock's testimony regarding the Commission's 1.5 embryo per deer reproduction target rate, the manner in which deer reproduction rates are determined, and the Forest Service's and DCNR's role in the Commission's management of the deer herd. He further explained that there is no direct correlation between complaints about deer and hunters demands in the allocation of licenses. The CAC first addresses these concerns and then submits a unified recommendation to the Commission.

Charles Bolgiano, Ph.D., was also deposed. Bolgiano is a member of Sportsmen. He believes a "sustainable deer population" is that number of deer that over time will not be reduced to zero due to biological reasons or any other reason. Documents, Vol. II, Ex. F., at 41. In 2000, Bolgiano developed a deer management program that treated publicly owned lands differently than privately owned lands in the allocation of antlerless licenses. The Commission dropped Bolgiano's program, he believes, due to influences of other people/groups with different objectives. He believes the Commission's issuance of around 800,000 licenses in 2007 was excessive because it denied the deer herd an opportunity to re-establish its numbers. He would like to see better communication between the Commission and Sportsmen. He testified Sportsmen have no input into management of the deer herd.

Bolgiano admitted he is not qualified to determine what a reasonable number of doe licenses would have been in 2007; rather, the Commission should discuss the number of deer licenses with Sportsmen. However, based on the DCNR's aerial surveys, there are less than 10 deer per square mile.

Bolgiano stated the Commission should base reproduction data on examination of 100 deer per WMU; this would be a reliable number. The Commission should conduct its own aerial surveys, at its own expense if necessary, and collect additional data from deer harvesting reports and information collected from meat processing facilities and deer check stations. Bolgiano testified that some WMUs have too many deer and others have too few. Notably, Bolgiano testified that the Commission is properly managing the WMUs in urban

areas. He identified WMU 2G and 2F as particularly problematic.

Bolgiano testified that the Commission has open public meetings but he believes Sportsmen should be more involved in the Commission's determination of how many deer licenses it issues and distributes. He testified the habitat should determine how many deer are in an area. He believes that if hunter success rates returned to the levels experienced in the 1980s, it would evidence an adequate opportunity to hunt in Pennsylvania.

Stephen Mohr, also a member of Sportsmen and former Game Commissioner, testified. Like Bolgiano, Mohr could not testify as to the number of hunting licenses the Commission should have issued in 2007. Mohr testified that the Commission lacks any scientific data to support its determinations as to the numbers of licenses issued; he is waiting for the necessary information to be developed. He believes that Pennsylvania should incorporate data used by other states in the management of their deer herd, although he failed to identify what types of data other states use.

Mohr recognized that deer management in Pennsylvania must satisfy all social, economic, political and scientific concerns. He stated that there is no problem with the entire deer population in Pennsylvania, just in specific WMUs.

Of particular note, Mohr stated that one proven method of assessing the health of the deer herd is to collect road-killed deer and determine the number of fetuses. The problem, however, is that the Commission is not collecting enough deer for examination. Some WMUs collect more samples than other WMUs. Mohr stated that examination of 100 deer per WMU is needed to satisfy the political, social, and economic impact deer have. He believes the Commission should have mandatory reporting of deer harvest and utilize check stations.

He otherwise could not identify what specific types of surveys the Commission should conduct to assess the deer population.

Mohr believes the Commission should publish in the Pennsylvania Bulletin the number of licenses it will issue at least 60 days prior to the public meeting announcing the number of licenses. He believes the maximum sustainable yield would vary by WMUs depending on the habitat. Of interest, Mohr testified that hunters should have the right to pursue a deer population in the WMU of their choosing.

Greg Levengood was also deposed. Levengood, a hunter since age 12, was the Chairman of Sportsmen at the time of filing of the instant petition. Levengood acknowledged that the Legislative Budget and Finance Committee commissioned the Wildlife Management Institute (WMI) to audit the Commission's deer management program. He disagreed, however, that the resolution properly focused the inquiry. In particular, Levengood agreed that the Commission's method of managing the deer herd is appropriate and that the independent audit confirmed the Commission's methodology. However, his concern is whether there was a scientific justification for reduction in the deer herd in the first instance. Levengood recognized that the WMI report was in favor of the deer management program.

Finally, James Slinsky was deposed. Slinsky is a radio talk show host, and his show focuses on outdoor issues. He claims to have interviewed over 1,031 persons, including every major deer project leader in the country. In preparation for his radio show, Slinsky stated he does significant amounts of research into hunting game management, fishing management, and issues of global warming, and he has published numerous articles. He is an

advisor to Sportsmen. He testified there are three methods of deer management: traditional, where there is a two-week buck season followed by a three-day doe season; an "either/or" system, where a hunter may kill either a buck or a doe; or "annihilation," where doe and buck seasons are run concurrently. According to Slinsky, the Commission is in the annihilation mode. In his opinion, Slinky believes the deer population to be less than three deer per square mile. Some WMUs have more deer, and others have less. He believes the deer population is dangerously low and the deer management program is too aggressive. He opined habitat is key; better habitats result in greater deer reproduction.

Slinsky stated Pennsylvania's deer management program is out of line with other states, although he offered no specific examples of other states' programs. He believes the Commission based its program on fraud and lies. He spoke briefly on WMUs 2F and 2G, two big wooded areas, which form a "V" in the Commonwealth. He said he would be happy with a 10–15% buck harvest rate.

### Discussion

Pennsylvania Rule of Appellate Procedure 1532 provides in pertinent part:

> (b) Summary Relief. At any time after the filing of a petition for review in an ... original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear.

■ Pa. R.A.P. 1532 provides similar relief to that envisioned under the Rules of Civil Procedure relating to summary judgment. Pa. R.A.P. 1532, Note. The court may grant summary relief when a party's right to judgment is clear and no material issues of fact are in dispute. *Brittain v. Beard,* 601 Pa. 409, 974 A.2d 479 (2009);

*U.S. Orgs. for Bankruptcy Alternatives, Inc. v. Dep't of Banking,* 991 A.2d 370 (Pa.Cmwlth.2010). We must review the record in a light most favorable to the non-moving party and resolve all doubts as to the existence of a genuine issue of material fact against the movant. *Thornton v. Phila. Housing Auth.,* 4 A.3d 1143 (Pa. Cmwlth.2010).

■ The management of Pennsylvania's wildlife is a discretionary function relegated to the expertise of the Commission. "An administrative agency has wide discretion in establishing rules, regulations and standards, and also in the performance of its administrative duties and functions." *Marshall v. State Employees' Ret. Sys.,* 887 A.2d 351, 359 (Pa.Cmwlth.2005)(quoting *Daneker v. State Employes' Ret. Bd.,* 156 Pa.Cmwlth. 511, 628 A.2d 491 (1993)). As such, we may review the Commission's discretionary acts only upon a showing of fraud, bad faith, capricious action, or abuse of discretion. *Finucane v. Pa. Milk Mktg. Bd.,* 135 Pa.Cmwlth. 606, 581 A.2d 1023, 1025, n. 1 (1990) (challenge to milk board's order creating bracket system for price of milk products); *Lily Penn Food Stores, Inc. v. Pa. Milk Mktg. Bd.,* 80 Pa.Cmwlth. 266, 472 A.2d 715, 718 (1984)("[t]he setting of milk prices for skim milk is a discretionary function committed to the expertise of the board"). "To constitute an abuse of discretion, the [administrative agency] must have based its conclusion upon wholly arbitrary grounds, in capricious disregard of competent evidence." *Lily Penn,* 472 A.2d at 719.

■ In addition, we are cognizant that [t]he right to hunt game is but a privilege given by the Legislature, and is not an inherent right in the residents of the State.... [The State's] power to regulate and prohibit hunting and killing of

game has always been conceded. This subject has been a fruitful source of zealous intention to define and supervise wild birds, animals, game and fish; to regulate how they are preserved and taken, declare the open and closed season when they may be taken; the manner and amount of the killing; and the device, implement and method permitted.

*Pa. Game Comm'n v. Marich,* 542 Pa. 226, 232, 666 A.2d 253, 256 (1995) (quoting *Commonwealth v. Patsone,* 231 Pa. 46, 48–49, 79 A. 928, 929 (1911)) (internal quotation marks omitted).

We agree with the Commission that Sportsmen have failed to show that the Commission's implementation of its deer management program is an abuse of discretion. Initially, we address the claims that the Commission's use of road-killed deer to determine reproduction rates and deer health is unscientifically reliable and the number of samples upon which the Commission relies is inadequate.

■ Sportsmen have failed to demonstrate that use of road-killed deer reproductive rates is unscientific. To the contrary, Sportsmen witness Mohr testified that a proven method of estimating the deer herd health is the collection of road-killed deer and examination of any fetuses. Nearly every witness testified that examination of approximately 100 deer would be an ideal sampling in order to estimate reproductive rates. Notwithstanding, Sportsmen failed to present any evidence that the Commission's "target rate" of a 1.5 embryo per doe reproduction rate is based on wholly arbitrary grounds. Ro-

senberry testified that a larger sampling is not always necessary so long as the sample size produces a coefficient of less than 13%, which is sufficient for accurate population management.[7] Sportsmen offered no testimony disputing Rosenberry's opinion that a 13% coefficient of variation is scientifically reliable.

In addition to reproductive data, and with the exception of aerial surveys and check stations, it appears the Commission utilizes those methods of managing the deer population proposed by Sportsmen. The Commission collects data from harvest reports from hunters and from meat processors. Documents, Vol. 1, Ex. A, at 26; Ex. C, at 22–23. The data collected includes the deer's sex and age, and antler characteristics from male deer. *Id.* Dividing the number of deer processed by the number of harvest reports returned to the Commission results in a calculated harvest reporting rate. Sportsmen failed to refute the Commission's reliance on harvest data as the primary source of population trend information.

Sportsmen have likewise failed to establish the Commission's goal of a healthy habitat, and the method by which the Commission attempts to meet this goal, is an abuse of discretion. To the contrary, Bolgiano testified that one way to measure deer health is to view the state of the habitat. Documents, Vol. II, Ex. F, at 78, 97 ("I think that the habitat in [the] area determines how many deer there should be."). Similarly, Slinsky testified that habitat is a key component in determining the number of deer per WMU. Documents, Vol. III, Ex. I, at 54 ("WMUs vary. You

---

7. In his report, Rosenberry explained that a coefficient of variation is "the standard error (i.e. a measure of variability in the sample) divided by the point of estimate. For example, if the standard error was 0.5 and the point of estimate was 5.0, the coefficient of variation would be 10 percent (i.e., 0.50/5.0–0.10). The greater the variability in the sample, the higher the standard error, and the less reliable will be the result." Documents, Vol. III, Ex. J, at 9.

see, habitat is the key. And you know, habitat, of course, is food based and nutrition and so forth.").

The Commission relies on reports issued by the U.S. Forest Service to ascertain the health of Pennsylvania's forest habitat. Sportsmen have offered nothing to suggest the Commission's reliance on the Forest Service's methodology and appraisals lack scientific basis or are in some other way unreliable. Likewise, Sportsmen do not contend the Commission's reliance on the U.S. Forest Service's reports constitute fraud, bad faith, capricious action or an abuse of discretion.[8]  *Finucane; Lily Penn Food Stores, Inc.*[9]

We further agree Sportsmen failed to demonstrate the Commission's manage-

ment of the deer herd has reduced the deer population to below sustainable levels, as alleged in the petition for review. Our review of the deposition testimony reveals that Sportsmen do not contest the Commission's management of the deer herd generally; the concern is limited to specific WMUs. Documents, Vol. II, Ex. F. at 90–92; Ex. G, at 36, 118–119; Vol. III, Ex. I, at 54. In fact, Slinsky testified he believes hunters are generally happy with the Commission's antlered deer restrictions, but are unhappy about the doe program, Documents, Vol. III, Ex. I, at 58, and nearly every Sportsmen witness testified some WMUs have too many deer and others have too few. In addition, Bolgiano testified "the sustainable population is not the important thing.... [T]he [Commis-

---

**8.** Neither counsel seriously questioned any witness about the Commission's goal of reducing human-deer conflicts.

**9.** We have reviewed the Wildlife Management Institute's (WMI) independent report. The report concludes that the Commission (1) allows for public input into defining consequences of the deer management program; (2) attempts to comply with its constitutional mandate and its current goals reflect that mandate; (3) does not pander to economic or stakeholders' interests; and (4) developed a credible population manual and strives to improve the precision of its data.

The WMI report, however, is also critical of the Commission. For example, the WMI report concluded the Commission uses a scientifically valid method for calculating population size for each WMU but recommended the Commission seek an alternative to the embryos per adult doe as a measure of habitat health *or* delete herd health as a goal and place additional resources into evaluation of the forest habitat. The WMI also criticized the Commission on reporting techniques and forest regeneration measures. Nevertheless, the WMI report concluded, at length:

Based on comparisons of hunter efforts and harvest among 14 northeastern states and provinces, it appears deer hunters in Pennsylvania have relatively good hunting opportunity, with the state ranking fourth in

hunter density and harvest success, and ranking second in kill per unit effort and third in kill per square mile (2007).

Comparison of the deer management programs and processes in eight states, including Pennsylvania, indicated that, while there were a few differences in procedures and techniques among the states, all eight addressed management of white-tailed deer in a very similar manner. WMI found nothing in this comparison that would be considered problematic in the [Commission's] general approach to deer management by professional wildlife biologists. The [Commission] appears to be at the forefront of developing techniques to assess impacts of deer on forest habitat quality.

The [Commission] however, continues to be subjected to considerable criticism from hunters about deer management programs. Most states have had a period of time when deer management goals, practices or decisions were controversial, but Pennsylvania is unique in that the period of controversy seems to have never waned. The strained nature of the relationship between the [Commission] and some hunters is problematic and, in the long-term, damaging to society's perception of how hunters and the [Commission] must work together to conserve and maintain the deer resource for the benefit of all the people.

Documents, Vol. III, Ex. K, at 64–65.

sion] must provide adequate opportunity to hunt the wildlife resources of the State." Documents, Vol. II, Ex. F, at 66.

We recognize the Commission does not physically count the deer population and perhaps it needs to look at arguably more efficient methods of estimating deer counts/harvest rates and communicating such to the public. Nevertheless, the WMI provided an estimated deer population per WMU in its report. Documents, Vol. III, Ex. K, at App. C. Sportsmen offered no evidence estimating the number of deer in Pennsylvania or contesting the WMI's estimate. Sportsmen's witnesses base their testimony regarding an inadequate opportunity to hunt on anecdotal statements from other hunters who complain that they are not seeing deer while hunting.[10] This is insufficient to raise a material issue of fact as to whether the Commission's Management Plan is reducing the deer herd below a sustainable level and/or whether hunters are deprived of an adequate opportunity to hunt.

Finally, the petition for review alleges the Commission does not allow for public input. We disagree. All witnesses, including those of Sportsmen, testified that Sportsmen are members of the CAC, or community advisory committee. When the CAC members reach a consensus on a particular matter, they submit their recommendation to the Commission. Indeed, the Commission based its current Management Plan goals in part on the recommendation of the CAC. Although Sportsmen would like a bigger voice in the Commission's deer management related decisions, they must recognize it is not the only member of the CAC and the Commission is in the unenviable position of trying to satisfy all CAC members and their divergent views. Perhaps each WMU could have a representative on the CAC.

In sum, Sportsmen's position is merely a disagreement with the Commission's method in managing the deer herd. Sportsmen offered nothing to suggest the Commission based its Management Plan on fraud or bad faith or that the Commission's actions constitute capricious action or an abuse of discretion. "Bold unsupported assertions of conclusory accusation cannot create genuine issues of material fact." *Brecher v. Cutler*, 396 Pa.Super. 211, 578 A.2d 481, 483 (1990); *see also Mid–Atlantic Power Supply Ass'n v. Pa. Public Util. Comm'n*, 746 A.2d 1196, 1200 (Pa.Cmwlth.2000)("[m]ere bald assertions, personal opinions or perceptions do not constitute evidence"). Accordingly, we grant the Commission's motion for summary judgment.

### ORDER

NOW, February 8, 2011, the respondents' motion for summary judgment is granted and the Chief Clerk shall enter judgment in favor of respondents.

The non-jury trial scheduled for February 28, 2011, at 10:00 a.m., Courtroom 3001, Pennsylvania Judicial Center, Harrisburg, Pa., is cancelled.

---

**10.** In addition, assertions such as those uttered by Slinsky (the radio talk show host) that the Commission based its program on "fraud and lies" is the type of tabloid hyperbolic sound bite that lacks factual foundation and strains credulity. Such accusations unfairly denigrate the Commission's efforts as well as Sportsmen's sincere efforts to rationally communicate about the common goals of managing wildlife for the benefit of all who enjoy the use and beauty of Pennsylvania's woods.