Irene JACKSON, Appellant

v.

PORT AUTHORITY OF ALLEGHENY COUNTY.

Commonwealth Court of Pennsylvania.

Argued Nov. 9, 2010.
Decided Dec. 28, 2010.
Publication Ordered March 14, 2011.

P. William Bercik, Pittsburgh, for appellant.

Colin Meneely, Pittsburgh, for appellee.

BEFORE: COHN JUBELIRER, Judge, and BROBSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Irene Jackson (Jackson) appeals from the Order of the Court of Common Pleas of Allegheny County (trial court), which granted a motion for summary judgment in favor of the Port Authority of Allegheny County (PAT) based upon the "jerk or

jolt" doctrine and dismissed Jackson's Complaint against PAT for negligence.

Jackson filed a Complaint in which she alleged that she was a passenger on a PAT bus. "As the bus was approaching Jackson's stop, she stood up to get off." (Compl.¶ 6.) "The bus driver missed the stop and slammed on the brakes, causing Plaintiff to be thrown forward onto her right knee." (Compl.¶ 6.) Jackson alleges that she suffered a broken knee cap as a result of the negligent operation of the bus and sought damages for medical bills, and pain and suffering for the injury to her knee. (Compl.¶ 12.)

An arbitration hearing was held on September 4, 2009 at which Jackson and her granddaughter, Aryana Williams (Williams), testified. The Board of Arbitrators entered an award in Jackson's favor, after which PAT timely filed an appeal to the trial court, along with a Motion for Summary Judgment based upon the "jerk or jolt" doctrine. PAT argued that the testimony of Jackson and Williams failed to establish the presence of a jerk or jolt that was so unusual or extraordinary as to permit recovery. The trial court agreed with PAT, and granted summary judgment pursuant to Pa. R.C.P. No. 1035.2(2),[1] explaining that this case is governed by *Meussner v. Port Authority of Allegheny County*, 745 A.2d 719 (Pa.Cmwlth.2000). Jackson now appeals to this Court.[2]

The question before this Court is whether the trial court properly granted summary judgment when it applied the "jerk or jolt" doctrine in Jackson's case, thereby prohibiting any attempt by her to establish any inference of liability of the common carrier, PAT. The essence of this doctrine has been summarized by our Supreme Court as follows:

> It is well established by a long line of decisions that testimony indicating that a moving trolley car jerked suddenly or violently is not sufficient, of itself, to establish negligence in its operation. There must be a showing of additional facts and circumstances from which it clearly appears that the movement of the car was *so unusual and extraordinary as to be beyond a passenger's reasonable anticipation,* and *nothing short of evidence that the allegedly unusual movement had an extraordinarily disturbing effect upon other passengers,* OR *evidence of an accident, the manner of the occurrence of which or the effect of which, upon the injured person inherently establishes the unusual character of the jolt or jerk, will suffice.*

*Connolly v. Philadelphia Transportation Company*, 420 Pa. 280, 283, 216 A.2d 60, 62 (1966) (emphasis added) (quoting *Staller v. Philadelphia Rapid Transit Co.*, 339 Pa. 100, 103, 104, 14 A.2d 289, 291 (1940)). "[W]here the negligence charged is an unusual or extraordinary jump or jerk of a

---

1. Rule 1035.2 provides:

    After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

    . . . .

    (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of

facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. Pa. R.C.P. No. 1035.2.

2. "Our standard of review, where a trial court grants or denies summary judgment, is limited to determining whether the trial court committed an abuse of discretion or an error of law." *Sicuro v. City of Pittsburgh*, 684 A.2d 232, 235 (Pa.Cmwlth.1996).

trolley car, the burden is upon the plaintiff to prove the extraordinary character of the jump or jerk in order to make out a case." *Meussner*, 745 A.2d at 721 (quoting *Sanson v. Philadelphia Rapid Transit Co.*, 239 Pa. 505, 508, 86 A. 1069, 1070 (1913)).

Both PAT and Jackson rely on portions of the testimony of Jackson and Williams to support their arguments, and the trial court attached the relevant pages of the transcript to its Opinion. Jackson testified that she rides the bus "about three times a week" and had been riding a PAT bus "[a]ll my life." (Hr'g Tr. at 4, R.R. at 42a.) She stated that she pulled the bell for the bus to stop, that the bus driver "went past the stop, and [the bus] jerked when she went past her stop sign. When it jerked, that's when I fell down." [3] (Hr'g Tr. at 5, R.R. at 43a.) Jackson testified that the bus driver "stomped on the brakes" and Jackson fell onto her right knee. (Hr'g Tr. at 6, R.R. at 44a.) Jackson further indicated that, when she fell, she also slipped on ketchup and water spilled from others who had been eating on the bus and recently exited. Williams testified about what occurred on the bus. She told her grandmother to pull the cord before they missed their stop. According to Williams, the bus did not stop at the stop sign, but stopped at the corner. Williams did not fall and said that she was holding onto the bars on the side of the bus. Williams described the incident as, "a hard stop. She really hit the brake. And then my grandmother fell down.... It wasn't like the point you normally you [sic] stop, you jerk a little bit forward. It was like everybody jerked forward." [4] (Hr'g Tr. at 24,

---

3. Jackson had the following exchange with her attorney about what happened that day:

Q. On this particular date did something unusual happen?
A. Yes, I was coming—I got on the bus at downtown Pittsburgh, going home; and we rode on home. The bus driver took us home, and as I got to get ready to get off—I stopped which I thought it was my stop. I had pulled the bell for the bus to stop.
Q. I would like to interrupt you briefly. You said you thought it was your stop or was it actually your stop?
A. Yes, it was.
Q. It was your stop?
A. Yes.
Q. Was it a regular bus stop?
A. Yes, it is.
Q. So it wasn't a special request?
A. Yes, it was a special request but that was my regular stop.
Q. Does the bus stop there regularly?
A. Yes.
Q. So what happened as you were getting ready to—you said that you signaled for a stop?
A. Yes.
Q. What happened after that?
A. The bus, I guess she didn't see the stop or she never stopped. She went past my stop, my bus stop, like in the middle of the intersection and when she—I got up, and I was paying my fare, and like I said, she went past the stop, and it jerked when she went past her stop sign. When it jerked, that's when I fell down.
Q. Was there a stop sign at the intersection?
A. Yes, there was. Where I usually got off there is a stop sign. But she didn't stop right there. She went past my stop sign.
Q. And this was—this was the stop at the intersection?
A. Yes.
Q. So is my understanding correct you were intending to get off at the stop sign at the intersection?
A. Yes. That's before I usually get off at.
Q. Did the bus stop for the stop sign?
A. No, no.
Q. Where did the bus actually wind up stopping?
A. Toward the end of the corner, past the stop sign.
Q. Okay. And at that point, what happened?
A. At that point, that's when the bus, she stomped on her brakes and I went down.
(Hr'g Tr. at 4–6, R.R. at 42a–44a.)

4. Williams testified as follows:

A. We drove, we rode on the bus to where our stop was. The bus driver apparently missed our bus stop. We pulled the bell

26, R.R. at 64a, 66a.) When Jackson and Williams left the bus, there were four other passengers remaining on the bus, none of whom were injured or were thrown from their seats.

In granting summary judgment in the instant case, the trial court relied on *Meussner*. In that case, Mr. and Mrs. Meussner were riding on a bus when Mrs. Meussner pulled the stop signal, they stood up, and began to move forward. The Meussners testified that the bus "jerked to a sudden stop" and that Mr. Meussner fell down and was injured. *Id.* at 720. Mrs. Meussner almost fell down, and no other passengers fell or were hurt. Mrs. Meussner said the stop was "real hard." *Id.* at 721. In *Meussner* this Court stated that, in order to recover, a passenger on a bus must not only establish that there was a jerk or stop, but that "the jerk or stop was so unusual and extraordinary as to be beyond a passenger's reasonable anticipation." *Id. Meussner* relied upon *Connolly* in noting that there are two ways to show that the jerk or stop was so unusual and extraordinary as to merit submission to a jury: (1) by showing that the stop had an "extraordinarily disturbing effect upon other passengers"; or, alternatively, (2) by showing that "the manner of occurrence of the accident or its effect on the plaintiff inherently establishes the unusual character of the jolt or jerk." *Id.* at 721.

Jackson argues that the trial court misapplied the "jerk or jolt" doctrine and, therefore, summary judgment should not have been granted. She relies upon *Buzzelli v. Port Authority of Allegheny County*, 674 A.2d 1186 (Pa.Cmwlth.1996), to suggest that with her testimony of an unusually hard stop, the burden shifted to PAT to "explain" the reason for the hard stop. *Id.* at 1188, 1190. In *Buzzelli*, this Court reversed and remanded with instructions for a new trial, stating that plaintiff's evidence, if credited, was sufficient to establish an unusual or extraordinary stop. Therefore, this Court held that the trial court should have charged the jury with a clear statement that an explanation from the carrier would be required if the testimony of the unusually hard stop, given all the circumstances, was sufficient to meet the threshold requirements under the "jerk or jolt" doctrine. *Buzzelli*, 674 A.2d at 1190.

Jackson's reliance upon *Buzzelli* is misplaced. The facts in *Buzzelli* provide a sufficient basis from which a jury could find that the stop was extraordinary. Importantly, the stop in *Buzzelli* was unanticipated by the plaintiff, whereas Jackson actually pulled the cord to request the stop and, thus, as in *Meussner*, it was anticipated. This Court emphasized in *Buzzelli* that the bus accelerated before coming to a sudden stop and then sat for a minute in the street without taking on passengers, stating "[t]here are no circumstances in which such a stop is within 'the ordinary and customary operation' of a common carrier bus." *Id.* at 1189 (quoting *Sanson v. Philadelphia Rapid Transit Co.*, 239 Pa. 505, 508, 86 A. 1069, 1070 (1913)). In fact, we found that "[s]uch testimony was sufficient, in itself, to establish an unusual stop requiring an explanation from the carrier." *Id.* In contrast, in this case, there was no acceleration and the bus did not stop in the

before the stop came up, because that's what I usually do. I told my grandmother to pull the cord before we missed our stop. We pulled the cord, and the bus driver continued to go past our stop. We pulled it again and she stopped, and it was like a hard stop. It was like—it was a hard stop. She really hit the brake. (Hr'g Tr. at 24, R.R. at 64a.) She also testified that "It was like, it was hard. She seriously missed the stop and she hit the brake really hard." (Hr'g Tr. at 25, R.R. at 65a.)

middle of the street or intersection for several minutes without taking on or letting off passengers. Instead, the bus stopped precisely because Jackson and Williams wished to disembark. Importantly, in *Buzzelli*, other passengers were thrown forward without being able to control their movement such that they knocked a passenger off her feet who was holding onto a railing. In the instant case, Jackson had risen from her seat while the bus was still moving, (Hr'g Tr. at 16, R.R. at 56a), and there was no evidence that she was holding on to a railing or bars. Williams testified that, although she was standing, she did not fall because she "was grabbing on to the bars on [the] side." (Hr'g Tr. at 26, R.R. at 66a.)

■ Jackson does not dispute that there were no other passengers who fell or were thrown from their seats, and that she also slipped on the ketchup and water on the floor. Similarly to *Meussner*, the testimony of Jackson and her granddaughter, (Hr'g Tr. at 17, 26, R.R. at 57a, 66a), taken in the light most favorable to Jackson, does not establish any possible inference that the stop caused an extraordinarily disturbing effect upon other passengers because no other passengers fell or were thrown from their seats. *Connolly*, 420 Pa. at 283, 216 A.2d at 62. Additionally, to show that the fall was "so violent and unusual as to permit the jury to predicate on it alone a finding that the jerk was extraordinary and unusual—requires more than losing one's balance while standing or walking in the bus." (Trial Ct. Op. at 3.) Although Jackson fell and injured her right knee, the trial court correctly noted that this was an injury that could occur if one loses balance while standing and an ordinary or moderate jerk occurs. As this

Court acknowledged in *Meussner*, it is common knowledge that one's balance is more easily lost when walking or standing in a moving bus than when seated. " 'It is common knowledge that a passenger can be thrown out of his seat only by an unusual or extraordinary jerk, whereas it is not unusual for persons to lose their balance while standing or walking in a car if an ordinary or moderate jerk occurs.' *Smith v. Pittsburgh Railways Co.*, 314 Pa. [541], 544, 171 A. [879], 880 [ (1934).]" *Meussner*, 745 A.2d at 721 (quoting *Hufnagel v. Pittsburgh Railways Co.*, 345 Pa. 566, 569, 29 A.2d 4, 6 (1942)) (first two alterations in original). *See also, Asbury v. Port Authority Transit of Allegheny County*, 863 A.2d 84 (Pa.Cmwlth.2004) (plaintiff was the only passenger not seated who fell down when bus accelerated). Additionally, Jackson testified that she also slipped on ketchup and water where kids had been eating, but her Complaint does not raise any claims on the condition of the bus. (Trial Ct. Op. at 4.)[5] For all of these reasons, the trial court's reliance on *Meussner* is proper. Moreover, the facts are nearly indistinguishable. In both cases the plaintiffs did not present evidence which could support a finding of a stop so extraordinary as to be beyond a passenger's reasonable expectation; therefore, the trial court did not abuse its discretion or commit an error of law in granting summary judgment based upon the "jerk or jolt" doctrine.

Jackson also argues that there should be no summary judgment where there "is unchallenged evidence that the common carrier was negligent in producing the jerk or jolt." (Jackson's Br. at 11). Jackson contends that she introduced evidence that the driver was negligent in failing to stop

---

5. PAT argues that had such a claim been made, it would be immune from liability as there is no exception to immunity for that.

(PAT's Br. Summ. J. at 9–10, R.R. at 37a–38a.)

at the bus stop (which she sometimes refers to as "running the stop sign") and that, because she is not relying on an *inference* of negligence, the "jerk or jolt" doctrine is not applicable. She cites *Connolly*, in support of her contention that the trial court should have permitted the negligence of the driver to be considered independently from the "jerk or jolt" doctrine. In *Connolly*, a bus passenger sustained personal injuries when a truck cut in front of the bus on which she was riding, causing the bus to stop suddenly. Connolly, who had just stood up to disembark, "was thrown to the floor with such force as to render her unconscious." *Connolly*, 420 Pa. at 282, 216 A.2d at 62. Connolly presented testimony from another passenger that the bus had been traveling between 25–30 miles per hour, swaying from side to side and passing other vehicles prior to the sudden stop. *Id.* at 284, 216 A.2d at 63. The jury concluded that the bus driver's speed was excessive under the circumstances and contributed to the injury. Jackson argues that, similar to the excessive speed of the bus driver in *Connolly*, she has introduced evidence of negligence regarding the bus driver here (failing to stop at the bus stop) to explain the stop and this is sufficient to make negligence on the part of PAT a jury question.

The Supreme Court, in *Connolly*, did not view the negligence of the bus driver as separate and unrelated to the "jerk or jolt" doctrine. Instead, it states that "[t]he basis for *an unusual or extraordi-nary stop* by a bus resulting in injury to a passenger calls for some explanation on the part of the common carrier." *Id.* at 283–284, 216 A.2d at 62. Thus, there must first be an "unusual or extraordinary stop" before an explanation is required for such a stop. It is the stop, itself, which Jackson alleges caused her injury; her argument is that the bus driver negligently ran the stop sign, which is what caused the unusual or extraordinary stop.[6] However, that argument still requires that the stop be unusual or extraordinary. Here, viewing Jackson's testimony in a light most favorable to her, we must conclude that Jackson's testimony is not sufficient to establish the "unusual or extraordinary stop" so as to require an explanation. Jackson neither presented facts and circumstances from which it clearly appears that the movement of the bus was so unusual and extraordinary as to be beyond a passenger's reasonable anticipation, nor did she present evidence that the bus had an extraordinarily disturbing effect upon other passengers when it stopped. In sum, Jackson's testimony and evidence, taken in its most favorable light, was not sufficient to make negligence on the part of PAT a jury question.

Discerning no error in the trial court's order, we affirm.

### ORDER

NOW, December 28, 2010, the order of the Court of Common Pleas of Allegheny

---

6. We note that the testimony of Jackson and her granddaughter, even when taken in the light most favorable to Jackson, shows that the bus did not run a stop sign, but may have stopped just past the sign and before entering the intersection. On direct examination, Jackson testified as follows:

Q. Did the bus stop for the stop sign?
A. No, no.
Q. Where did the bus actually wind up stopping?
A. Toward the end of the corner, past the stop sign.
(Hr'g Tr. at 6, R.R. at 44a.) On cross examination, Jackson acknowledged:
Q. Well, as I understand your testimony, she went past the stop sign?
A. Yes, she did.
Q. And stopped at the corner?
A. Yes.
(Hr'g Tr. at 16, R.R. at 56a.)

County in the above-captioned matter is hereby **AFFIRMED.**