# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| George Norman Green | : |
| | : |
| v. | : No. 65 C.D. 2015 |
| | : Argued:  October 6, 2015 |
| Southeastern Pennsylvania | : |
| Transportation Authority, | : |
| Appellant | : |

BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION BY
PRESIDENT JUDGE PELLEGRINI          FILED: October 28, 2015

Southeastern Pennsylvania Transportation Authority (SEPTA) appeals the order of the Philadelphia County Court of Common Pleas (trial court) denying its motion for post-trial relief following a jury trial and entering judgment in favor of George Norman Green (Green) and against SEPTA in the amount of $250,000.00.  We vacate and remand.

## I.

On the morning of February 2, 2013, Green and his wife Barbara boarded SEPTA's Route G bus at a bus stop just past the intersection of 58th Street and Chester Avenue in Philadelphia to travel northbound on 58th Street.  After paying their fares, Green followed his wife to find seats when the bus driver

suddenly jammed the brakes causing his body to swing backwards. As Green grabbed the pole with his right hand to keep from falling, his body twisted and he suffered an injury to his right shoulder requiring surgery.

As a result, in March 2013, Green filed a complaint against SEPTA seeking damages for his injuries. Following discovery, the trial court denied SEPTA's motion for summary judgment alleging that Green failed to produce evidence demonstrating a prima facie case of negligence under the "jerk and jolt" doctrine[1] and denied SEPTA's motion to certify its order for interlocutory appeal.

---

[1] As the Pennsylvania Supreme Court has explained:

> A common carrier for hire, although not an insurer, owes to its passengers the highest degree of care. … 'It is well established by a long line of decisions that testimony indicating that a moving trolley car jerked suddenly or violently is not sufficient, of itself, to establish negligence in its operation. There must be a showing of additional facts and circumstances from which it clearly appears that the movement of the car was so unusual and extraordinary as to be beyond a passenger's reasonable anticipation, and nothing short of evidence that the allegedly unusual movement had an extraordinarily disturbing effect upon other passengers, or evidence of an accident, the manner of the occurrence of which or the effect of which upon the injured person inherently establishes the unusual character of the jolt or jerk, will suffice.'
>
> The basis for an unusual or extraordinary stop by a bus resulting in injury to a passenger calls for some explanation on the part of the common carrier, and although negligence may not be inferred from a sudden stop sufficiently explained, testimony of witnesses, however, that the excessive speed of the bus was a contributing cause of the accident certainly requires some explanation or rebuttal….

*Connolly v. Philadelphia Transportation Company*, 216 A.2d 60, 62 (Pa. 1966) (citations omitted).

2

At trial, Green testified that he was 45 years old, that he had lived in the neighborhood in which he boarded the bus his whole life, and that he had used the Route G bus many times. He stated that he boarded the bus at the 58th Street and Chester Avenue stop because it is one block from his home. He testified that the next bus stop was one city block at Springfield Street. Green stated that after he and his wife boarded, the bus pulled away from the stop quickly, causing him to sway more than usual, but that he caught his balance. He testified that the driver then suddenly and unexpectedly slammed on the brakes seconds after leaving the stop causing his whole body to swing backwards. (Reproduced Record (RR) 198a). He stated that he grabbed the first available pole and got a good grip with his right hand, but that he braced his back which caused him to twist and caused the muscle to pull away from the bone in his shoulder. He testified that he landed with his body in contact with the black box behind the driver's seat. He stated that while the other passengers were seated, "the gasp in the air was like, whoa" and that he could hear that they were moved in their seats. (*Id.* at 230a, 250a).

Green testified that the bus unexpectedly stopped before it reached the next bus stop one city block away, explaining that it "hadn't even moved the length of an average sofa" and "[t]hat's not a normal thing for a bus to do. I mean that was just unexpected. It was way out of the ordinary." (RR 200a). He stated that "it was a Saturday morning, really nobody was out there, it was cold, but, you know, it was a quick ride, and every stop he kind of pulled in and whipped out, pulled in and whipped out. But I just don't know why he jammed his brakes at that particular stop." (*Id.* at 201a). He explained:

> I would say that the one I never expected, something so simple as holding on, having to reach out and hold on would go this far. That was more than just a sudden stop. The driver jammed his brake and I was jolted back. It was not a normal jolt. It was made to seem like this is normal, this could happen to anybody at any time. Your muscle just won't tear away from your bone with something that could happen at any time. I've been physical all my life. I've done physical things all my life. Something like that just doesn't happen to anybody.

(*Id.* at 228a).

Green stated that he immediately felt pain and a burning sensation in his right shoulder. In differentiating this incident from a prior slip and fall affecting his right shoulder, he testified, "To me – it felt like this was violently ripped from the bone, like it's more violent than catching yourself falling. … I mean you take a vehicle that size and you move it at a certain amount an hour, and then you take a hundred and seventy pounds and reach out and try to stop it from snapping backwards, it's a big difference…. It's hard to explain, but catching yourself falling and having your arm jerked and twisted back, there's a big difference…." (RR 211a). He stated that he continued to feel pain in his shoulder for 20 days prompting him to go to the emergency room at the University of Pennsylvania.

Green testified that he underwent physical therapy for two months and received pain medication and injections and ultimately underwent surgery by Mark Avart, D.O. (Dr. Avart), three months later to repair his torn rotator cuff. He stated that following the surgery, he felt "[l]ike crap, like I shouldn't have did [sic] it, like

4

it was never going to get any better, depression" and that he had to wear a sling for six weeks. (RR 213a-214a). He explained that following therapy and a cortisone injection, he has "minimum pain, but it's still there" and that he is working part-time at a dry cleaner. He testified that although he did not report his injury at the time it happened, he noted that the bus driver was a black male and first notified the SEPTA claims department ten days after the incident.

Barbara Green testified, corroborating her husband's version of what transpired. She stated that she and her husband were walking to the back of the bus when the bus moved forward very fast and she felt a jerk or jolt two to three seconds later and had to grab onto a pole to keep from falling. She stated that while she expected "some kind of movement on the bus," during the incident "you really had to balance yourself" and "had to make sure you're focused and balanced, and that stop came out of nowhere." (RR 278a-279a). She testified that she did not see what the other passengers were doing at that moment, but that she heard them, "like when you're about to – your body's about to jerk, oh, you know, but I didn't see anyone." (RR 274a). She testified that she and her husband went to their seats and "he started complaining, moving his [right] shoulder and his arm, and saying something doesn't feel right, you know, it feels funny, and he felt a burning sensation." (RR 275a). She stated that she initially thought that it was a pulled muscle and that he would get better, but as time went on he couldn't move his arm and that after the surgery "it just seemed like everything went downhill. He regretted getting the surgery. He was in more pain than ever. He was depressed, moping around" and that "he has stopped working." (RR 281a). She testified, however, that in the last couple of months, "he's more upbeat," he started

5

working part-time for a dry cleaning company, but he's not as active as he used to be. (RR 282a -283a).

Dr. Avart, an orthopedic surgeon, testified by video deposition stating that an MRI of Green's right shoulder showed a partial and a full rotator cuff tear. (N.T. 5/12/14[2] at 35). He opined, within a reasonable degree of medical certainty, that Green's right shoulder injuries was caused by the bus accident. (*Id.* at 27). He testified that there was significant pain and impingement on Green's right shoulder before the operation. Dr. Avart stated that he performed arthroscopic surgery on the right shoulder tears by inserting a screw and stitching the rotator cuff. He testified that the injury to Green's right shoulder injury was "chronic and permanent," limited Green's use of his right shoulder despite the medical intervention, and that Green was in pain several months after the operation. (*Id.* at 28-29, 31, 47-48).

Anthony Sheridan (Sheridan), a part-time employee in SEPTA's video evidence unit, testified that while DVRs are recording all the time on SEPTA's buses, no recording of the February 2, 2013 incident was preserved because it was not reported at the time. Sheridan stated that there were six drivers of buses on the G route on that date and identified Hakim Gantz as the driver at the time of the incident. At the close of Green's case, the trial court denied SEPTA's motion for nonsuit.

---

[2] "N.T. 5/12/14" refers to the transcript of Dr. Avart's May 12, 2014 video deposition testimony admitted as Green's Exhibit P-1.

6

SEPTA presented the video deposition testimony of Joseph Bernstein, M.D. (Dr. Bernstein), a board-certified orthopedic surgeon. He stated that following review of Green's records and his examination, "if you take the history that Mr. Green's shoulder was yanked on the bus and he developed acute symptoms from that, and the findings at the time of surgery and the MRI and you put them together, then there's an injury here, uh, and it is related to the accident." (N.T. 5/19/14[3] at 1). Dr. Bernstein explained:

> But beyond that it looks like a rotator cuff that needed surgery. The surgery was done. Mr. Green looks like he has a decent result. As I noted on my examination, there are some limitations of motion, that does happen. It doesn't mean Dr. Avart did anything wrong whatsoever. Some of mine go that way too. It looks like a fairly typical result after rotator cuff surgery.

(*Id.* at 18).

Finally, SEPTA called Hakim Gantz who testified that he drove the Route G bus on February 2, 2013, but that he did not recall coming to a sudden stop or seeing any passengers fall at around 8:03 a.m. near the intersection of 58th Street and Chester Avenue. He stated that he did not recall any incidents or accidents that occurred on that date on that route, but that if something had occurred, he would have stopped the bus, contacted SEPTA's control center, asked if the passengers were okay, and completed a written report. (RR 335a). At the

---

[3] "N.T. 5/19/14" refers to the transcript of Dr. Bernstein's May 19, 2014 video deposition admitted as SEPTA's Exhibit D-2.

close of evidence, the trial court denied SEPTA's motion for a directed verdict. (*Id.* at 351a).

Over SEPTA's objection, the trial court issued to the jury, *inter alia*, Pennsylvania Standard Jury Instruction 13.130 regarding a common carrier's standard of care with a sudden stop prior to its deliberations.[4] The trial court

---

[4] Standard Jury Instruction 13.130 states:

A "common carrier" is a transportation service licensed to carry passengers or property.

Under Pennsylvania law, a "common carrier" must use the highest standard of care in [operating its vehicle] [and] [maintaining its equipment and facilities] [and] [transporting its passengers].

[*name of defendant*] in this case is a "common carrier" and must use the highest standard of care.

Common carriers must sufficiently explain [sudden] [unusual] [extraordinary] [stops] [jolts] [jerks].

To prove that [*name of defendant*] was negligent, [*name of plaintiff*] must prove the following:

1. [*name of defendant*] suddenly [stopped] [jolted] [jerked] the [*name of vehicle type*]; and

2. the passenger[s] could not reasonably anticipate the sudden [stop] [jolt] [jerk]; and

3. [*name of defendant*] did not sufficiently explain the [stop] [jolt] [jerk].

[*name of plaintiff*] does not have to prove other passengers were also injured in order for you to find [*name of defendant*] negligent.

**(Footnote continued on next page…)**

8

denied SEPTA's request to instruct the jury that "The mere fact that the Plaintiff sustained damages does not prove or give rise to any inference that SEPTA was responsible for those damages" because SEPTA failed to provide any case law in support of such an instruction. (RR 364a-365a, 447a).

Following deliberations, the jury issued a verdict finding SEPTA negligent; finding that SEPTA's negligence was a factual cause of harm to Green; and awarding Green $250,000 in damages. The trial court denied SEPTA's post-trial motion for judgment notwithstanding the verdict (JNOV) or for a new trial.[5]

---

**(continued…)**

Pennsylvania Standard Jury Instruction 13.130 (Civ. 2014).

In this regard, the trial court issued the following instruction to the jury in this case:

> Now, I'm going to read to you what the duty of care is by this defendant. The defendant in this case is a common carrier. A common carrier is a transportation service. It's licensed to carry passengers. Under Pennsylvania law, a common carrier like this defendant must use the highest standard of care in operating its vehicle. Common carriers must sufficiently explain any sudden, unusual, extraordinary stop or jolt or jerk. To prove that this defendant was negligent, the plaintiff must prove the following: That the defendant suddenly stopped, jolted, jerked the bus, and that the passenger could not reasonably anticipate the sudden stop, jolt, jerk, and that the defendant did not sufficiently explain the stop or the jolt or the jerk, and the plaintiff does not have to prove other persons were injured in order for you to find that the defendant was negligent.

(RR 405a-406a).

[5] As the trial court explained:

**(Footnote continued on next page…)**

9

## II.

In this appeal, SEPTA claims[6] that the trial court erred in instructing the jury that SEPTA is a common carrier; erred in instructing the jury regarding the "jerk and jolt" doctrine; erred in failing to instruct the jury that the mere happening of an accident does not raise an inference of negligence;[7] and erred in failing to grant summary judgment, nonsuit and JNOV[8] because Green failed to present

---

**(continued…)**

> At trial, Mr. and Mrs. Green presented credible evidence that they regularly traveled on the G bus, that there were no traffic control devices between their boarding stop and the next stop, and that the driver slammed on the brakes causing an extraordinary jerk, jolt and stop which Plaintiff did not anticipate based on prior experience. At this point the burden of proof shifted to the Defendant, Septa, to produce testimony justifying the sudden jerk, jolt, and stop. However, Septa was not able to produce a driver who could explain why the bus suddenly stopped. Plaintiff's expert, Mark Avart, D.O., testified that the incident on the bus caused a right rotator cuff tear. Under the circumstances, the jury had credible testimony upon which to base their [sic] verdict, and it would have been improper for the trial court to grant Compulsory Nonsuit, and/or JNOV.

(Trial Court 5/13/15 Opinion at 10).

[6] We reorder SEPTA's claims in the interest of clarity.

[7] In reviewing a claim alleging error in a jury charge, we must view the charge in its entirety taking into consideration all the evidence of record and determine whether or not that error was prejudicial to the complaining party. *Lockhart v. List*, 665 A.2d 1176, 1179 (Pa. 1995). To constitute reversible error, a ruling on a jury instruction must be shown not only to have been erroneous but also harmful to the complaining party. *Anderson v. Hughes*, 208 A.2d 789, 792-93 (Pa. 1965).

[8] Our review of the trial court's ruling on a motion for JNOV or for a new trial is limited to determining whether the court abused its discretion or committed an error of law. *Marker v. Commonwealth of Pennsylvania, Department of Transportation*, 677 A.2d 345, 347 (Pa.
**(Footnote continued on next page…)**

10

sufficient evidence demonstrating the "jerk and jolt" doctrine to recover damages as a matter of law.

## A.

"A common carrier is 'one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally.'" *Lynch v. McStome & Lincoln Plaza Associates*, 548 A.2d 1276, 1279 (Pa. Super. 1988) (citation omitted). While SEPTA may not fall within the definition of "common

---

**(continued…)**

Cmwlth.), *appeal denied*, 685 A.2d 549 (Pa. 1996). In deciding whether JNOV is warranted, the reviewing court must consider the evidence and any conflicts therein in a light most favorable to the verdict winner who is afforded the benefit of all reasonable factual inferences that arise from the evidence. *Id.* JNOV will be granted only in clear cases where the facts are such that no two reasonable persons could fail to agree that the verdict was improper. *Id.*

Our standard of review in determining the propriety of the entry of a nonsuit is that it is proper only if the factfinder, viewing all of the evidence in favor of the plaintiff, could not reasonably conclude that the essential elements of a cause of action have been established. *Joyce v. Boulevard Physical Therapy & Rehabilitation Center*, 694 A.2d 648, 652 (Pa. Super. 1997), *appeal denied*, 740 A.2d 1148 (Pa. 1999). "When a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement." *Id.* at 652-53 (citation omitted).

Finally, our review of an order granting or denying summary judgment is limited to determining whether the trial court committed an error of law or abused its discretion. *Fogarty v. Hemlock Farms Community Association, Inc.*, 685 A.2d 241, 242 n.1 (Pa. Cmwlth. 1996), *appeal denied*, 694 A.2d 624 (Pa. 1997). Summary judgment is only appropriate when, after examining the record in the light most favorable to the non-moving party, there is no genuine issue of material fact, and the moving party clearly establishes that he or she is entitled to judgment as a matter of law. *Bost-Pearson v. Southeastern Pennsylvania Transportation Authority*, 118 A.3d 472, 474 n.1 (Pa. Cmwlth. 2015).

11

carrier" within the provisions of the Public Utility Code and the jurisdiction of the Public Utility Commission (PUC),[9] SEPTA clearly fits within the foregoing definition by providing public transportation by bus for compensation and has long been recognized as such for purposes of determining its duty with respect to its passengers and the standard of care that it must use in its operations.[10] As noted

---

[9] As SEPTA notes, Section 102 of the Public Utility Code defines "common carrier" as "all persons or corporations … holding out, offering or undertaking … service for compensation to the public for the transportation of passengers…." 66 Pa. C.S. §102. Section 102 defines "corporation" as "all bodies corporate, joint-stock companies, or associations … but shall not include municipal corporations…," and defines "municipal corporations" as "any authority, or body whatsoever created or organized under the law of this Commonwealth for the purpose of rendering any service similar to that of a public utility…." *Id.* As a result, SEPTA correctly asserts that it is not a "common carrier" within the jurisdiction of the PUC. *But cf.* Section 103(b) of the Public Utility Code, 66 Pa. C.S. §103(b) ("Except as otherwise provided in this part, nothing in this part shall abridge or alter the existing rights of action or remedies in equity or under common or statutory law of this Commonwealth, and the provisions of this part shall be cumulative and in addition to such rights of action and remedies."); Section 3309(a) of the Public Utility Code, 66 Pa. C.S. §3309(a) ("The liability of public utilities, contract carriers by motor vehicles, and brokers for negligence, as heretofore established by statute or by common law, shall not be held or construed to be altered or repealed by any of the provisions of this part.").

Nevertheless, being a common carrier is not dependent on whether the entity is subject to PUC jurisdiction, but whether it holds itself out legally to provide public transportation services. SEPTA was created in 1963 to take over the business of providing transportation that was formerly provided by private transportation companies such as the Philadelphia Transportation Company, Philadelphia Suburban Transportation, Schuylkill Valley Lines and/or the Penn Central and Conrail. *See Application of Philadelphia Suburban Transportation Co.*, 264 A.2d 180 (Pa. Super. 1970); *Southeastern Pennsylvania Transportation Authority v. Philadelphia Transportation Co.*, 38 Pa. D. & C.2d 653, 654–55 (1965). In short, SEPTA is a common carrier. *See also Reilly by Reilly v. Southeastern Transportation Authority*, 489 A.2d 1291, 1306 (Pa. 1985).

[10] *See, e.g., Reilly by Reilly*, 489 A.2d at 1306 ("The other assignments of error: namely … [the trial court's] charge to the jury regarding [SEPTA]'s duty as a common carrier and regarding [the passenger]'s duty to exercise due care, were adequately handled by Superior Court.") (footnote omitted); *Reilly by Reilly v. Southeastern Transportation Authority*, 484 A.2d 1390, 1391 (Pa. Super. 1984) ("Whether [SEPTA]'s duty as a common carrier had ended as to **(Footnote continued on next page…)**

12

above, "a common carrier for hire, although not an insurer, owes to its passengers the highest degree of care." *Connolly*, 216 A.2d at 62 (citation omitted). *See also Lynch*, 548 A.2d at 1279 ("The law is well settled in Pennsylvania that only owners/operators of common carriers are held to the highest degree of care.") (citation omitted). As a result, the trial court did not err in instructing the jury that SEPTA is a common carrier for purposes of determining its duty and the standard of care due its customers, including Green.

**B.**

With respect to the "jerk and jolt" doctrine, the plaintiff must establish that the jerk or stop of the bus was so unusual and extraordinary so as to be beyond his reasonable anticipation by demonstrating either that the stop had an extraordinarily disturbing effect on the other passengers or evidence of an accident, the manner of the occurrence of which or the effect of which upon the injured person inherently establishes the unusual character of the jerk or jolt. *Connolly*, 216 A.2d at 62; *Meussner v. Port Authority of Allegheny County*, 745 A.2d 719, 721 (Pa. Cmwlth. 2000). "To permit an inference that the jerk or jolt was excessive, based upon the effect upon other passengers, it must clearly be shown

_____

**(continued…)**

[the passenger], or in other words, whether when the accident occurred [the passenger] had had 'a reasonable opportunity to alight and pass out of danger,' depended on how the jury resolved this conflict [in the evidence]. Accordingly, it was not error for the trial court to instruct the jury on [SEPTA]'s duty as a common carrier.") (citation omitted); *Mangini v. Southeastern Pennsylvania Transportation Authority*, 344 A.2d 621, 623 (Pa. Super. 1975) ("There is no dispute that appellant SEPTA is a common carrier and therefore held to the highest degree of care. A public carrier is not an insurer of its passengers' safety, but liability is imposed for injuries resulting from negligent conduct on the part of the carrier.") (citations omitted).

not only that they were affected by the movement, but to a greater extent than is usual….” *Id.* at 722 (citation omitted). *See also Watson v. Pittsburgh Railways Co.*, 132 A.2d 718, 720 (Pa. Super. 1957) (“‘[I]t is common knowledge that a passenger can be thrown out of his seat only by an unusual or extraordinary jerk, whereas it is not unusual for persons to lose their balance while standing or walking in a car if an ordinary or moderate jerk occurs.’ We believe that the instant case falls within the exception to the general rule in that there is an extraordinary jerk, plus proof of the effect of the jerk on other passengers, plus evidence of speed, raising a question for the jury whether due care was used under the circumstances.”) (citation omitted).

## 1.

SEPTA first claims that the trial court’s instruction to the jury regarding the “jerk and jolt” doctrine was in error because it impermissibly imposes a duty on SEPTA to explain the jerk or jolt before Green demonstrated its negligence. However, the trial court explicitly charged the jury that it was Green’s burden to prove that SEPTA was negligent and the elements that he was required to prove in order to demonstrate its negligence. The trial court specifically instructed the jury that Green, “the plaintiff,” “has the burden of proving all of his claims” and was required to show that SEPTA “the defendant[,] suddenly stopped, jolted, [or] jerked the bus;” that “the passenger could not reasonably anticipate the sudden stop, jolt, [or] jerk….;” and that SEPTA, “the defendant[,] did not sufficiently explain the stop or the jolt or the jerk….” (RR 161a, 402a, 406a). Contrary to SEPTA’s assertions, in reading the entire instruction, it is clear that the trial court did not impermissibly impose a duty on SEPTA to explain the jerk or

14

jolt before Green demonstrated its negligence; did not mistakenly present an objective test as subjective by using the differing terms of "plaintiff" and "passenger;" and did not omit critical points of law necessary to properly determine SEPTA's negligence.[11]

As a corollary to that argument, SEPTA claims that the trial court erred in failing to instruct the jury that the mere happening of an accident does not establish negligence. However, the trial court specifically instructed the jury that "the plaintiff has the burden of proving all of his claims," and that "[t]he defendant denies the claims … so the issues that you have to decide in accordance with the law that I give you is, was the defendant negligent [and] was the defendant's negligent conduct a factual cause in bringing injury to the plaintiff." (RR 404a). Additionally, as outlined above, the trial court specifically instructed the jury regarding what Green had to prove under the "jerk and jolt" doctrine in order to find SEPTA negligent. (*Id.* at 406a). "It is well settled that a trial judge may properly refuse a litigant's requested instructions when the substance thereof had been adequately covered in the general charge." *Perigo v. Deegan*, 431 A.2d 303, 306 (Pa. Super. 1981). As a result, the trial court did not err in rejecting SEPTA's proposed instruction.

---

[11] A trial court has wide discretion in phrasing jury instructions. *Gaylord ex rel. Gaylord v. Morris Township Fire Department*, 853 A.2d 1112, 1115 (Pa. Cmwlth.), *appeal denied*, 864 A.2d 1205 (Pa. 2004). A charge will be found adequate unless the issues are not made clear to the jury, the jury was palpably misled by the trial court's instructions, or there is an omission in the charge that amounts to fundamental error. 853 A.2d at 1116. As outlined above, the trial court's instruction in this case is virtually verbatim from the Pennsylvania Standard Jury Instruction 13.130 (Civ. 2014).

**2.**

As to the merits, SEPTA argues that even viewing the pleadings and the evidence in a light most favorable to Green, it is clear that the trial court erred in failing to grant summary judgment, nonsuit and JNOV because Green failed to present sufficient evidence to invoke the "jerk and jolt" doctrine necessary to make out SEPTA's liability.

In *Buzzelli v. Port Authority of Allegheny County*, 674 A.2d 1186 (Pa. Cmwlth. 1996), the case relied upon by Green, is illustrative of what needs to be made out to invoke the jerk and jolt doctrine. In that case, the plaintiff was standing near the middle of a crowded bus holding onto the rail on a seatback. While she could not see out of the steamed windows, she estimated that the bus accelerated from the bus stop at 35 to 40 miles per hour (mph) in an area with a 25 mph speed limit when the driver suddenly slammed on the brakes and stopped the bus. The crush of the other standing passengers thrown forward by the stop knocked the plaintiff off balance and she fell. She immediately felt pain in her shoulder and neck after she was helped to her feet. The bus remained stopped for at least a minute and no passengers got on or off. While she did not say anything to the driver when she got off at her regular stop, she realized she was seriously hurt by the time she got to work and reported the incident to the bus company. She had suffered a herniated disc in her neck which required surgery and had some other permanent effects.

Another passenger testified that he was standing toward the front of the bus and that it was going at a normal rate of speed, but it was accelerating immediately before the stop. He bumped into others near him and almost everyone who was standing bumped into each other. He would have fallen but for his holding on tightly because of a prior knee operation. He heard a scream and saw others helping a woman up from the floor. Based on his experience riding buses, he characterized it as an unusual stop, similar to one where something came in front of the bus.

The bus driver testified that he recalled nothing unusual from the period in question and that he never heard a scream or threw a passenger. He stated that he never got a bus up to 45 mph on the road involved. However, he conceded that he did not have a specific recollection of the day in question, or anything unusual as described by the plaintiff and her witness, and he was not contacted by the bus company until 2-1/2 months later.

Prior to submitting the case to the jury, the trial court refused the plaintiff's request for a jury instruction to the effect that the demonstration of an unusual or extraordinary stop calls for an explanation from the bus company. On appeal, we determined that this constituted reversible error and remanded for a new trial, stating:

> [O]ne independent and sufficient basis for proving an unusual or extraordinary stop is to show an accident, the manner of occurrence of which inherently establishes the unusual character of the stop. Here, both Buzzelli and her witness testified that the bus was accelerating [to 35 or 40 miles per hour] immediately before it was taken to

17

a complete stop by a hard application of the brakes. Buzzelli testified further that the bus sat stopped in the street for over a minute, without taking on or letting off passengers. There are no circumstances in which such a stop is within "the ordinary and customary operation" of a common carrier bus. Such testimony was sufficient, in itself, to establish an unusual stop requiring an explanation from the carrier.

As for the effect on other passengers, Buzzelli testified that it was the crush of other standing riders thrown into her that caused her to fall. [Her witness] stated that he would have fallen but for his practice of always gripping a railing tightly. Cases unquestionably have characterized quite substantial jolts as being not unusual. On this closer question, which essentially requires the Court to distinguish among degrees of jolting or lurching, the Court concludes that Buzzelli's evidence also was sufficient. For standing passengers to be thrown forward without the ability to control their movement, such that they knock a passenger who is holding on to a railing off her feet, is an effect to a greater extent than is usual. If the effects described here were held to be within the reasonable anticipation of transit riders, then the principle that common carriers are held to the highest degree of care in regard to their customers would be rendered virtually meaningless.

*Buzzelli*, 674 A.2d at 1189 (citations and footnote omitted). We concluded that "[b]ecause Buzzelli's evidence, if credited, was sufficient to establish an unusual or extraordinary stop, it was incumbent on the trial court to inform the jury clearly that such a stop calls for an explanation by the defendant carrier, under *Connolly* and its predecessors…." *Id.* at 1190.

We recently amplified what is necessary to make out the jerk and jolt doctrine in *Martin v. Southeastern Pennsylvania Transportation Authority*, 52

18

A.3d 385 (Pa. Cmwlth. 2012). First, we reviewed previous cases involving the application of the jerk and jolt doctrine recounting:

> [I]n *Asbury v. Port Authority of Allegheny County*, 863 A.2d 84 (Pa. Cmwlth. 2004), a third-trimester pregnant plaintiff boarded a transit authority bus and fell while walking to her seat when the bus accelerated away from the stop. The plaintiff's fall resulted in a broken femur. Applying the jerk and jolt doctrine, the trial court held the plaintiff failed to present sufficient evidence of negligence as a matter of law. In so doing, the trial court determined the plaintiff failed to establish the alleged jerking or jolting of the bus "had a disturbing effect on other passengers or that the nature of the accident inherently established the unusual character of the jolting movement." *Id.* at 88. On appeal, this Court affirmed.
>
> In *Meussner*, a sudden stop case, a standing passenger preparing to exit a bus fell and suffered injuries when the bus suddenly jerked to a stop. The injured passenger's wife standing next to him almost fell; she described the stop as "real hard." However, no other passengers fell or were hurt. Noting that it is not unusual for standing passengers to lose their balance and fall on a moving trolley or bus due to an ordinary or moderate jerk, we affirmed the trial court's grant of non-suit in *Meussner*. We reasoned the plaintiffs failed to present any evidence which could legally support a finding of a stop so unusual or extraordinary as to be beyond a passenger's reasonable anticipation.
>
> More recently, in *Jackson v. Port Authority of Allegheny County*, 17 A.3d 966 (Pa. Cmwlth. 2011), we again applied the jerk and jolt doctrine in a case involving a sudden stop. In *Jackson*, the plaintiff and her granddaughter rose from their seats and pulled the bell cord to signal for a stop as the bus approached their stop. The bus driver missed the stop and "stomped on the brakes." *Id.* at 968. The sudden stop caused the plaintiff to fall and she suffered a broken kneecap.

19

Thereafter, the plaintiff and her granddaughter testified at an arbitration hearing. The plaintiff testified she fell on her knee when the driver stomped on the brakes. The plaintiff also stated she slipped on ketchup and water on the floor spilled by other passengers. The plaintiff's granddaughter, however, testified she did not fall because she held onto a bar. She further testified there were four seated passengers on the bus who were not injured or thrown from their seats. The arbitrators entered an award for plaintiff.

The transit authority appealed and filed a motion for summary judgment. Relying on *Meussner*, the trial court entered summary judgment. On appeal, this Court also held the evidence, viewed in a light most favorable to plaintiff, failed to establish that the stop itself was so unusual or extraordinary as to be beyond a passenger's reasonable anticipation. Thus, the jerk and jolt doctrine barred the plaintiff's claim in *Jackson*.

*Martin*, 52 A.3d at 389-90.

We went on to distinguish *Buzzelli* explaining:

Plaintiff's reliance on *Buzzelli* is misplaced [because] *Buzzelli* is readily distinguishable. Although *Buzzelli* involved an acceleration and sudden stop, the plaintiff in *Buzzelli* presented evidence of excessive speed and an unusual stop which flung a crush of passengers into her and knocked her down. Both of these factors are evidence of an unusual, unanticipated movement of the bus supporting a presumption or an inference of negligence by the bus driver. Consequently, the plaintiff in *Buzzelli* met her threshold burden of demonstrating an unusual jerk or jolt requiring an explanation by the transit authority.

Conversely, in the present case, Plaintiff merely testified the bus started and stopped before she could

20

> reach a seat. Such circumstances are not beyond a passenger's reasonable anticipation. As we emphasized in *Meussner*, it is not unusual for a person to lose his or her balance while standing or walking on a bus if an ordinary or moderate jerk occurs. Nothing in Plaintiff's testimony supports a finding that anything more than an ordinary or moderate jerk or jolt happened here. Therefore, the trial court did not err in granting summary judgment under the jerk and jolt doctrine.

*Martin*, 52 A.3d at 391. We concluded that "the jerk and jolt test is difficult to meet." *Id.* at 390.

Viewing the evidence in a light most favorable to Green, there was not a showing of an unusual or extraordinary jerk necessary to invoke the jerk and jolt doctrine. As in *Martin*, Green and his wife merely testified that the bus accelerated quickly from the bus stop after they had gotten on, and that the bus driver then unexpectedly jammed on the brakes and stopped the bus in the absence of any traffic control devices and prior to reaching the next bus stop. He testified that the force of the stop knocked him over and required him to grab the pole with such force that it caused rotator cuff tears in his right shoulder.[12] However, there was no evidence of the bus's excessive speed or any other factors thereby inherently demonstrating that this was other than an ordinary jerk and jolt rather than extraordinary or exceptional jerk and jolt necessary to make out liability.

---

[12] The nature and extent of Green's injuries may not be used to demonstrate the extraordinary and exceptional nature of the jerk and jolt in this case. *See Asbury*, 863 A.2d at 90 ("The mere location, type and extent of the injury is not sufficient evidence upon which to reconstruct the physical events of the event. Such reconstruction must precede the solicitation of opinion evidence from a doctor that the injury was the result of a sudden or violent jerk or jolt so unusual and extraordinary as to be beyond a passenger's reasonable expectation.").

Moreover, just because both Green and his wife testified that the seated passengers were shifted in their seats and collectively let out an audible sigh when the bus came to a stop, without more, this is not sufficient to alternately demonstrate liability under the jerk and jolt doctrine due to an extraordinarily disturbing effect upon other passengers. *See, e.g., Jackson*, 17 A.3d at 970 ("[T]he testimony of Jackson and her granddaughter, taken in the light most favorable to Jackson, does not establish any possible inference that the stop caused an extraordinarily disturbing effect upon other passengers because no other passengers fell or were thrown from their seats.") (citation to record omitted); *Meussner*, 745 A.2d at 721 ("[T]estimony that other passengers merely lurched forward or were jostled about has been held not sufficient to establish a prima facie case."); *Monahan v. Pittsburgh Railways Co.*, 27 A.2d 534 (Pa. Super. 1942) ("There was no evidence of the effect of the action of the car on other passengers except that they became 'excited' and two or three of them 'bent over.'").

Accordingly, the trial court's order is vacated and the case is remanded to the court to enter judgment in favor of SEPTA and against Green.

_____
DAN PELLEGRINI, President Judge

22

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

George Norman Green           :
                                 :
         v.               : No. 65 C.D. 2015
                                   :
Southeastern Pennsylvania    :
Transportation Authority,      :
             Appellant     :

# **O R D E R**

AND NOW, this 28th day of October, 2015, the order of the Philadelphia County Court of Common Pleas dated December 19, 2014, at No. 130303123, is vacated and the matter is remanded to enter judgment in favor of Southeastern Pennsylvania Transportation Authority and against George Norman Green.

Jurisdiction is relinquished.

_____
DAN PELLEGRINI, President Judge